**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| A.D., R.G., T.B., E.W., M.H., S.B., C.C., K.F., C.M., A.O., A.H., and C.A., *individually and on behalf of all others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>ASPEN DENTAL MANAGEMENT, INC.,<br><br>Defendant. | Case No. 1:24-cv-01404<br>Hon. Virginia M. Kendall |

**DEFENDANT ASPEN DENTAL MANAGEMENT, INC.'S MEMORANDUM IN SUPPORT OF RULE 12(B)(6) MOTION TO DISMISS**

## INTRODUCTION

The named plaintiffs in this case, A.D., R.G., T.B., E.W., M.H., S.B., C.C., K.F., C.M., A.O., A.H., and C.A. ("Plaintiffs"), allege that Defendant Aspen Dental Management, Inc. ("Aspen Dental") violated their privacy rights by using digital analytical tools ("Pixel technology") on Aspen Dental's public website. ECF No. 7, Am. Compl. ¶ 8. Plaintiffs allege that Aspen Dental "installed" these "tracking technologies" on its website "to collect and disclose" Plaintiffs' personal information, resulting in their receipt of targeted marketing. *Id.* at ¶¶ 8, 306, 313, 320, 327, 334, 341, 348, 355, 362, 369, 375, 382.

Plaintiffs' Amended Complaint contains 640 paragraphs and spans 132 pages. *But cf. U.S. ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 378 (7th Cir. 2003) ("Rule 8(a) requires parties to make their pleadings straightforward, so that judges and adverse parties need not try to fish a gold coin from a bucket of mud."). Stripping away the unnecessary verbiage, the Amended Complaint makes a straightforward allegation: Plaintiffs visited Aspen Dental's website and Pixel technology placed on the website caused information regarding their visits, such as the links they clicked, to be transmitted to third parties such as Facebook and Google, which, in turn, used this information for marketing purposes. Am. Compl. ¶¶ 8, 306, 313, 320, 327, 334, 341, 348, 355, 362, 369, 375, 382. Plaintiffs allege this transmission violated the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). *Id.* at ¶¶ 222-233.

Yet even assuming that Plaintiffs' allegations are true, and that Plaintiffs have adequately alleged that Aspen Dental's actions violated HIPAA, these allegations do not translate into a plausible claim under either federal or Illinois law.[1] The Seventh Circuit, like every other federal

[1] Defendant assumes for the sake of this Motion that Illinois law applies to Plaintiffs' claims. *See, e.g.*, *Wild v. Gaskins*, 30 F. Supp. 3d 458, 462 (E.D. Va. 2014) ("If a factual inquiry is necessary to properly assess the choice of law issue, 'it can be inappropriate or impossible for a court to

circuit court that has considered the issue, has held that HIPAA creates no express or implied private right of action. *Stewart v. Parkview Hosp.*, 940 F.3d 1013, 1015 (7th Cir. 2019); *Carpenter v. Phillips*, 419 F. App'x 658, 659 (7th Cir. 2011); *Payne v. Taslimi*, 998 F.3d 648, 660 (4th Cir. 2021) (same; collecting cases); *see also Acara v. Banks*, 470 F.3d 569, 571 (5th Cir. 2006) ("Congress did not intend for private enforcement of HIPAA.").

In an attempt to circumvent this limitation, Plaintiffs bring fifteen common law and statutory claims, including under the federal Wiretap Act and the Illinois, Florida, Pennsylvania Massachusetts, and California wiretap acts, that are predominantly grounded in these alleged HIPAA violations. Plaintiffs' Amended Complaint should be dismissed with prejudice because these claims each fail to state a claim upon which relief can be granted. Accordingly, for these reasons and those set forth below, the Court should dismiss Plaintiffs' Amended Complaint with prejudice in its entirety under Rule 12(b)(6).

## LAW AND ARGUMENT

### I. Standard of Review.

"A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not the merits of the case." *Love v. Simmons*, No. 23-cv-2392, 2024 WL 809107, at *3 (N.D. Ill. Feb. 27, 2024). "In considering a motion to dismiss, the Court must accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in the plaintiff's favor." *Id.*

"To survive, the complaint must give the defendant fair notice of the basis for the claim, and it must be facially plausible." *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A claim has facial plausibility when the plaintiff

---

conduct that analysis at the motion to dismiss stage when little or no discovery has taken place.'") (quoting *In re Samsung DLP Television Class Action Litig.,* No. 07–2141, 2009 WL 3584352, at *3 (D.N.J. Oct. 27, 2009)).

pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678); *Castaneda v. Amazon.com, Inc.*, --- F. Supp. 3d ----, 2023 WL 4181275, at *4 (N.D. Ill. Jun. 26, 2023) (same).

## II. Plaintiffs' Federal Wiretap Act Claim Is Foreclosed by the Statute's "One-Party" Consent Rule (Count I).

Plaintiffs first bring a claim for an alleged violation of the federal Wiretap Act. Am. Compl. ¶¶ 409-438. Plaintiffs allege Aspen Dental "intercepted [their] electronic communications via the Pixels, Conversion API and other tracking technologies, which tracked, stored, and unlawfully disclosed [their] Private Information to third parties such as Facebook and/or Google." *Id.* at ¶ 421. Plaintiffs' federal Wiretap Act claim is foreclosed by the statute's "one-party" consent rule.

Under the Wiretap Act, it is not unlawful for a party to intercept its own communications, unless the party's expressed purpose for doing so at the time of the recording was to commit a crime or tort. Specifically, the statute provides:

> "It shall ***not*** be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication ***where such person is a party to the communication***," ***unless*** "such communication ***is*** intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State."

18 U.S.C. § 2511(2)(d) (emphasis added).

Moreover, to violate the statute through an alleged unlawful disclosure, as Plaintiffs claim here (Am. Compl. ¶ 421), there first must have been an unlawful interception of some communication. *See* 18 U.S.C. § 2511(1)(c); *see also Jurgens v. Build.com*, No. 4:17–cv–00783–AGF, 2017 WL 5277679, at *4 (E.D. Mo. Nov. 13, 2017) (holding that an "interception is a necessary element for each type of violation") (quoting *Bruce v. McDonald*, No. 3:13cv221–MHT (WO), 2014 WL 931522, at *2 (M.D. Ala. Mar. 10, 2014)); *Allen v. Quicken Loans Inc.*, No. 17-12352 (ES) (MAH), 2018 WL 5874088, at *3 (D.N.J. Nov. 9, 2018) ("Since claims under

subsection (c) and (d) are predicated on a violation of subsection (a), the Court considers all section 2511 claims together."); *Noel v. Hall*, 568 F.3d 743, 749 (9th Cir. 2009) (same).

Plaintiffs acknowledge both the one-party consent rule and the criminal or tortious conduct exception in their Amended Complaint. Am. Compl. ¶ 427. In an attempt to apply the exception here, Plaintiffs allege that Aspen Dental violated state and federal laws, including a provision of HIPAA that imposes a criminal penalty for knowingly disclosing individually identifiable health information to third parties. *Id.* at ¶¶ 427-436.

The Southern District of New York considered and rejected this same application of the exception in *In re DoubleClick Inc. Privacy Litigation*, 154 F. Supp. 2d 497, 515-19 (S.D.N.Y. 2001). The plaintiffs there attempted "to meet § 2511(2)(d)'s 'purpose' requirement by arguing that their six non-Wiretap Act claims against DoubleClick 'plead conduct that has underlying it a tortious purpose and/or that translates into tortious acts." *Id.* at 515. "In other words, by virtue of its tortious acts, DoubleClick must have had a tortious purpose." *Id.*

The court rejected this argument, instead holding "Section 2511(2)(d)'s legislative history makes clear that the 'criminal' or 'tortious' purpose requirement is to be construed narrowly, covering only acts accompanied by a specific contemporary intention to commit a crime or tort." *Id.* The court further held "the legislative record suggests that the element of 'tortious' or 'criminal' *mens rea* is required to establish a prohibited purpose under § 2511(2)(d)." *Id.*

For these reasons, the court held the plaintiffs had not adequately alleged their Wiretap Act claim. "DoubleClick's purpose has plainly not been to perpetuate torts on millions of Internet users, but to make money by providing a valued service to commercial websites." *Id.* at 519. "If any of its practices ultimately prove tortious, then DoubleClick may be liable for the resulting damage." *Id.* "However, a culpable mind does not accompany every tortious act." *Id.*

In *DoubleClick*, the Southern District of New York relied on the Seventh Circuit's opinion in *Desnick v. American Broadcasting Companies, Inc.*, 44 F.3d 1345, 1353-54 (7th Cir. 1995). The *Desnick* court affirmed the dismissal of a federal Wiretap Act claim under the exception based on the following analysis: "Maybe the program as it was eventually broadcast was tortious, for we have said that the defamation count was dismissed prematurely." *Id.* "But there is no suggestion that the defendants sent the testers into the Wisconsin and Illinois offices for the purpose of defaming the plaintiffs by charging tampering with the glare machine." *Id.* "The purpose, by the plaintiffs' own account, was to see whether the Center's physicians would recommend cataract surgery on the testers." *Id.*

More recently, in *Katz-Lacabe v. Oracle America, Inc.*, No. 22-cv-04792-RS. 2024 WL 1471299 (N.D. Cal. Apr. 3, 2024) (Seeborg, J.), the court dismissed plaintiff's federal Wiretap Act claim as re-pled in a second amended complaint. *Id.* at *2. The court rejected plaintiffs' arguments that the Wiretap Act's tortious or criminal conduct exception should apply and dismissed the claim without leave to amend, for the same overarching reason: "Plaintiffs fail to plausibly allege Oracle's underlying motivation in collecting and selling data about internet users was anything other than to generate revenue." *Id.* at *3 (citing *In re DoubleClick Inc. Priv. Litig.*, 154 F. Supp. 2d at 519; *In re Google Inc. Gmail Litig.*, No. 13–MD–02430–LHK, 2014 WL 1102660, at *18 n.13 (N.D. Cal. Mar. 18, 2014)); *see also id.* at *5 (same; "The fact data collection or sales might at some later point be deemed tortious does not justify application of the crime-tort exception.").

As set forth in *Desnick, In re DoubleClick*, and *Katz-Lacabe* merely acting for financial purposes is not sufficient to invoke the exception. Here, Plaintiffs most egregious allegation is that Aspen Dental used the marketing tools at issue "to increase its profit margins." Am. Compl. ¶ 428;

*id.* ("Defendant specifically used the Pixels and other tracking codes to track and utilize Plaintiffs' and Class members Private Information for its own financial benefit.").

Moreover, even commercial speech remains an act of speech, protected by the First Amendment. *See Bigelow v. Virginia*, 421 U.S. 809, 825 (1975) (recognizing commercial speech as protected speech; "[t]he advertisement published in appellant's newspaper did more than simply propose a commercial transaction. It contained factual material of clear 'public interest.'"); *Va. State Bd. of Pharm. v. Va. Citizens Cons. Council, Inc.*, 425 U.S. 748, 765 (1976) (same; "the free flow of commercial information is indispensable"); *Bates v. State Bar of Az.*, 433 U.S. 350, 376-77 (1977) (same; "Advertising is the traditional mechanism in a free-market economy for a supplier to inform a potential purchaser of the availability and terms of exchange.").

This is particularly so on the Internet. As the United States Supreme Court has held: "While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace—the 'vast democratic forum of the Internet' in general, and social media in particular." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017) (quoting *Reno v. Am. Civ. Lib. Un.*, 521 U.S. 844, 868 (1997)).

Thus, even if Plaintiffs could show that Aspen Dental's actions crossed the privacy threshold into a potential legal violation (they cannot), it does not mean that Plaintiffs have met the requirements of the federal Wiretap Act exclusion.[2] *See* Ex. A, *Mrozinski v. Aspirus, Inc.*, Case No. 2023CV000170, at *9 (Wisc. Cir. Ct., filed April 18, 2024) (attached hereto (dismissing

[2] Notwithstanding Judge Kennelly's recent decision to the contrary, with which Aspen Dental respectfully disagrees. *Kurowski v. Rush System for Health*, No. 22 C 5380, 2023 WL 8544084, at *3 (N.D. Ill. Dec. 11, 2023) (recognizing "HIPAA-exception-to-the-party exception"); *but cf. Cohen v. Casper Sleep Inc.*, No. 17-cv-9325, -9389, -9391, 2018 WL 33928772018 WL 3392877, at *3-4 (S.D.N.Y. Jul. 12, 2018) (rejecting argument that tortious or criminal conduct exception should apply to alleged internet tracking; "This too fails because Defendants did not intercept communications 'for the purpose' of committing a crime or tort.").

state wiretapping claim that, like analogous federal statute, has one-party consent rule subject to a tortious or criminal conduct exception).

Lastly, the exception could never apply here, because the underlying criminal or tortious acts must be *distinct* from the alleged wiretapping. *See Okash v. Essentia Health*, No. 23-482 (JRT/LIB), 2024 WL 1285779, at *5 (D. Minn. Mar. 26, 2024) (dismissing federal Wiretap Act claim because plaintiff failed to allege independent criminal or tortious conduct); *Jurgens*, 2017 WL 5277679, at *5, n. 4 (same; "But Plaintiff has neither alleged nor argued that Defendant intercepted or disclosed her communications for the purpose of committing a crime or a tort independent of the interception itself, and no such purpose is evident from the complaint."); *United States v. Jiau*, 734 F.3d 147, 152 (2d Cir. 2013) (confining exception to "instances where the recording party intends to use the recording to harm or injure a recorded party, such as to blackmail, threaten, or publicly embarrass the recorded party").

Accordingly, Plaintiffs' federal Wiretap Act claim should be dismissed.

## III. Plaintiffs Fail To Plausibly Allege Violations Of State Wiretap Acts.

Plaintiffs bring causes of action alleging violations of five state wiretap acts. Am. Compl. ¶¶ 519-542 (Illinois Eavesdropping Act); *id.* at ¶¶ 543-558 (Florida Security of Communications Act); *id.* at ¶¶ 633-640 (Pennsylvania Wiretap Act); *id.* at ¶¶ 574-582 (Massachusetts Wiretap Act); *id.* at ¶¶ 594-604 (California Invasion of Privacy Act). These causes of action fail to state a claim for relief that can be granted and should be dismissed under Rule 12(b)(6) for the reasons stated below.

### A. Plaintiffs' Illinois Eavesdropping Act Claim Should Be Dismissed (Count VII).

Plaintiffs' claim under the Illinois Eavesdropping Act consists of two distinct parts. First, Plaintiffs allege that Aspen Dental violated 720 ILCS 5/14-2(a). Am. Compl. ¶ 520. This provision

provides that a person or entity violates the Act when she "knowingly and intentionally…[u]ses an eavesdropping device, in a surreptitious manner, for the purpose of transmitting or recording all or any part of any ***private conversation***…unless he or she does so with the consent of all other parties ***to the private conversation***." 720 ILCS 5/14(a)(2) (emphasis added). Under 720 ILCS 5/14-1(d), however, "private conversation" is defined to mean "any ***oral communication*** between 2 or more persons." *Id.* (emphasis added); *see also Angelo v. Moriarty*, No. 15 C 8065, 2016 WL 640525, at *3-4 (N.D. Ill. Feb. 8, 2016). Because Plaintiffs' allegations in this case do not involve any alleged oral communications, 720 ILCS 5/14-1(d) is inapplicable.

Second, Plaintiffs allege Aspen Dental violated 720 ILCS 5/14-2(a)(5) of the statute. Am. Compl. ¶ 521. This provision addresses both electronic communications and oral communications. *See* 720 ILCS 5/14-2(a)(5) (prohibiting the use or disclosure of "any information which he or she knows or reasonably should know "was obtained from a private conversation or private electronic communication in violation of this Article").

Like the federal Wiretap Act, this provision of the Illinois Eavesdropping Act sets forth a one-party consent rule. *See* 720 ILCS 5/14-2(a)(3) (creating a cause of action for eavesdropping ***by a non-party*** without "the consent of all parties to the private electronic communication."). Yet, "unlike the federal Wiretap Act, the Illinois statute does not have a criminal or tortious exception to the party exception." *See Kurowski*, 2023 WL 4707184, at *12.

For these reasons, Plaintiffs allegations fail to state a claim under the Illinois Eavesdropping Act and Count VII of their Amended Complaint should be dismissed. *See also Zak v. Bose Corp.*, No. 17-cv-02928, 2020 WL 2762552, at *2 (N.D. Ill. May 27, 2020) (dismissing Illinois Eavesdropping Act claim; "Because Bose was a party to the communications, it cannot be held liable under the Wiretap Act or the Eavesdropping Statute.").

### B. Plaintiffs Do Not Adequately Allege a Cause of Action under the Florida Security of Communications Act (Count VII).

For there to be a violation of the Florida Security of Communications Act ("FSCA"), Plaintiffs must allege facts showing that there was an intentional interception of the contents of a wire, oral or electronic communication by a third party through the use of an electronic, mechanical, or other device. FLA. STAT. § 934.02(3). Plaintiffs cannot satisfy the elements of their FSCA claim because they have not pled facts plausibly establishing: (1) any alleged interception of the "contents" of a communication; (2) that a "device" was used to intercept any communication; or (3) that any "electronic communications" were intercepted.

*1. Plaintiffs fail to allege any plausible interception of "contents."*

Plaintiffs have not pled facts showing that the "contents" of any communication were intercepted and disclosed to third parties, including Facebook and Google. The FSCA prevents the interception of the "contents" of any communication. FLA. STAT. § 934.03(1)(a). Contents are "any information concerning the ***substance, purport or meaning of the communication***." *Id.* § 934.02(7) (emphasis added). The FSCA, like many states wiretapping laws, was modeled after the federal Wiretap Act. As a result, Florida courts follow federal courts as to the meaning of analogous provisions, including what constitutes "contents" of a communication. *See, e.g.*, *Minotty v. Baudo*, 42 So.3d 824, 831 (Fla. 4th Dist. Ct. App. 2010); 18 U.S.C. § 2510(8) (defining "contents").

Significantly, courts interpreting the Wiretap Act distinguish between "content" and "record" information. *See In re Google Cookie Placement Consumer Privacy Litig.*, 806 F.3d 125, 135–39 (3d Cir. 2015) (addressing the distinctions between content and routing/record information); *see also In re Zynga Privacy Litig.,* 750 F.3d 1098, 1106–07 (9th Cir. 2014) ("the term 'contents' refers to the intended message conveyed by the communication, and does not

include record information regarding the characteristics of the message that is generated in the course of the communication" such as a name, address, or the identity of a subscriber or customer).

*In Facebook Internet Tracking Litig.,* 140 F. Supp. 3d 922, 930-31 (N.D. Cal. 2015), the court held that a URL sent to Meta by a user's browser does not qualify as "contents" of a "communication" under the federal Wiretap Act because it is nothing more than "record information regarding the characteristics of the message that is generated in the course of the communication.'" *Id.* at 935 (quoting *In re Zynga*, 750 F.3d at 1106- 07). The court emphasized that "[p]laintiff may never be able to state [a] Wiretap Act claim, particularly since their arguments on this issue are so unpersuasive." *Id.* Under the facts alleged, a URL does not convey the "meaning" of the communication with the host server; it simply identifies the location of the requested webpage on the Internet. *In re Zynga,* the Ninth Circuit explained that a URL could disclose that a person viewed the "page of a gay support group," yet the court still held that such URLs "function[ ] like an 'address,'" not "contents" of a communication. 750 F.3d at 1107.

Multiple courts similarly have held that information regarding what webpage a user views does not constitute the "content" of a message. *See Goldstein v. Costco Wholesale Corp. ("Costco")*, 559 F. Supp. 3d 1318, 1322 (S.D. Fla. 2021) (finding that "Plaintiff's claim that Defendant recorded pages and content he viewed on Defendant's website [had] no bearing on the Court's analysis."); *Gonzales v. Uber Techs., Inc.*, 305 F. Supp. 3d 1078, 1086 (N.D. Cal. 2018) (finding no contents and dismissing argument "that the user was communicating he wanted to view that webpage").

Following this analogous federal precedent, a Florida Circuit Court held that allegations that the defendant intercepted plaintiff's alleged electronic communications including "mouse clicks, movements, keystrokes, search terms, information inputted by Plaintiff, and pages and

content viewed by Plaintiff" were insufficient to state a FSCA claim. *Jacome v. Spirit Airlines, Inc*., No. 2021-000947-CA-01, 2021 WL 3087860, at *4 (Fla. Cir. Ct. June 17, 2021). The *Jacome* court found that this information was "precisely the type of non-record information that courts consistently find do not constitute 'contents' under the Federal Wiretap Act or any of its state analogs because it does not convey the substance or meaning of any message." *Id.* This reasoning has since been adopted by multiple courts when granting motions to dismiss FSCA claims. *See Cardoso v. Whirlpool Corp.*, No. 21-CV-60784-WPD, 2021 WL 2820822, at *2 (S.D. Fla. Jul. 6, 2021); *Swiggum v. EAN Services*, LLC, 8:21-CV-493-TPB-CPT, 2021 WL 3022735, at *2 (M.D. Fla. July 16, 2021); *Goldstein v. Luxottica of America, Inc.*, No. 21-80546-CIV, 2021 WL 4093295 at **2–3 (S.D. Fla. Aug. 23, 2021*), report and recommendation adopted*, No. 21-80546-CIV, 2021 WL 4125357 (S.D. Fla. Sept. 9, 2021).

Plaintiffs fail to allege facts showing that the ***substantive contents*** of their (or anyone's) communications have ever been transmitted to third parties. Plaintiffs A.H. and M.G. allege that the intercepted communications were "the URLs visited, the medical conditions and types of treatments searched, and appointment details." Am. Compl. ¶ 549. Specifically, Plaintiffs allege "[w]hen Users visit Defendant's Site via an HTTP Request to Aspen's server, Defendant's server sends an HTTP Response, including the Markup that displays the Webpage visible to the user and Source Code (with the Pixel)." *Id.* at ¶ 138; *id.* at Fig. 3, pg. 37 (illustration of HTTP communication); *id.* at Fig. 4 (illustration showing "appointment details," i.e., an Aspen Dental location). These allegations are insufficient to plead any "contents" as defined by the FSCA. *See Costco*, 559 F. Supp. 3d at 1322 (granting motion to dismiss where plaintiff did not plausibly allege contents were intercepted).

2. *Plaintiffs fail to allege any plausible interception by a "device."*

Plaintiffs' FSCA claim also fails because they do not adequately allege that any electronic communications were intercepted using an electronic, mechanical, or other "device." The FSCA defines an "electronic, mechanical, or other device" as "any device or apparatus which can be used to intercept a wire, electronic, or oral communication" with limited exceptions for certain tangible objects including telephone equipment and hearing aids. FLA. STAT. § 934.02(4). Plaintiffs fail to allege any facts sufficient to support their assertion that Pixel technology is a "device" that can be used to intercept communications. Plaintiffs merely make the conclusory allegation that "Pixels, Google Analytics, cookies," "tracking codes and programs," website browsers, "computing and mobile devices, and "web and ad-servers" constitute electronic or other devices through which the contents of "wire, oral, and electronic communication" can be intercepted. Am. Compl. ¶ 554.

In dismissing FSCA claims on the basis that software is not a "device," one Circuit Court of Florida found it persuasive that "other courts have held that software, email servers, and drives do not constitute devices under the wiretapping statutes." *Jacome*, 2021 WL 3087860, at *5 (granting Defendant's motion to dismiss because, *inter alia*, session replay software was not a "device" under FSCA).[3]

[3] *See Potter v. Havlicek*, No. 3:06-CV-211, 2008 WL 2556723, at *8 (S.D. Ohio Jun. 23, 2008) (dismissing federal wiretap claim because "the word 'device' does not encompass software"); *Crowley v. CyberSource Corp.*, 166 F. Supp. 2d 1263, 1269 (N.D. Cal. 2001) ("Holding that Amazon, by receiving an e-mail, intercepted a communication within the meaning of the Wiretap Act … would effectively remove from the definition of intercept the requirement that the acquisition be through a 'device.' Therefore, the amended Complaint fails to state a claim against Amazon under the Wiretap Act, and Amazon's motion to dismiss that claim is granted."); *see also Ultimate Outdoor Movies, LLC v. FunFlicks*, LLC, No. CV SAG-18-2315, 2019 WL 2233535, at *21 (D. Md. May 23, 2019) ("Moreover, the emails were sent, as addressed, to Defendants' funflicks.com server, and that server is not a 'device' used for interception as defined by the Wiretap Act."). Thus, software that helps Aspen Dental provide web services to its customers is simply not a "device" as contemplated under FSCA. *Jacome*, 2021 WL 3087860, at *3 ("The Court further finds that Congress did not intend for the Federal Wiretap Act to extend to the use of commonplace analytics software to improve a website browsers' experience and the FSCA, being modeled after the Federal Wiretap Act, likewise does not extend to the use of commonplace analytics software to improve a website browsers' experience.").

The Court should follow the reasoning of *Jacome* and various other courts to hold that Plaintiffs' allegations concerning Pixel technology are insufficient to state a claim for relief under the FSCA.

3. *Plaintiffs fail to allege any electronic communications were intercepted.*

Finally, the Court should dismiss Plaintiffs' FSCA claim because they have not alleged any "electronic communications" that Aspen Dental or Pixel technology intercepted. As with the other FSCA elements, Plaintiffs simply assert that Aspen Dental "facilitated Facebook's interception and collection" of their information "by embedding the Meta Pixel and other third party tracking codes on its Website." Am. Compl. ¶ 553.

The FSCA defines "electronic communication" to mean the "transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects intrastate, interstate, or foreign commerce," but specifically excludes "[a]ny communication from an electronic or mechanical device which permits the tracking of the movement of a person or an object." FLA. STAT. § 934.02(12)(c).

Software designed to track a person's navigation of a website are specifically excluded as electronic communications under the FSCA. In *Jacome*, the court found that session replay software that was alleged to track and intercept "mouse clicks and movements, keystrokes, search terms, information inputted by Plaintiff, and pages and content viewed by Plaintiff" when she was browsing the website is "definitionally excluded from the term 'electronic communications'" under the FSCA. 2021 WL 3087860, at *3–5. In *Costco*, the court dismissed wiretap claims because the "mere tracking of Plaintiff's movements on [a] website is the cyber analog to

record[ing] information Defendant could have obtained through a security camera at a brick-and-mortar store." 559 F. Supp. 3d at 1321.

Thus, like the courts in *Jacome* and *Costco*, this Court should find that Pixel technology, which Plaintiffs allege tracks a user's actions on Aspen Dental's website (Am. Compl. ¶ 8), is definitionally excluded from the meaning of a protected "electronic communication" under FSCA, and their claim should be dismissed for this independent pleading failure.

### C. Plaintiffs' Fail to State a Claim for Violation of Pennsylvania Wiretap Act Cause of Action (Count XV).

Plaintiffs fail to state a violation of Pennsylvania's Wiretapping and Electronic Surveillance Control Act ("WESCA"), which prohibits the intentional interception, use, or disclosure of a "wire, electronic, or oral communication" unless one of several exceptions apply. *See* 18 PA. CONS. STAT. §§ 5703, 5704. WESCA liability does not extend to wholly out-of-state conduct. *Popa v. Harriet Carter Gifts, Inc.*, 52 F.4th 121, 130 (3d Cir. 2022); *Larrison v. Larrison*, 750 A.2d 895, 898 (Pa. Super. 2000). For there to be a violation of WESCA, Plaintiffs must plead that the "contents" of their "electronic communication" were unlawfully "intercepted" while the communications were in transit, by use of a "device" in Pennsylvania. 18 PA. CON. STAT. §§ 5702, 5703, 5725. Plaintiffs cannot satisfy the elements of their WESCA claim because: (1) they have not alleged any plausible interception of the "contents" of an "electronic communication;" (2) there are no plausible allegation that a "device" was used to intercept any communication; (3) the Complaint is silent as to where the alleged interceptive conduct occurred; and (4) they have not pled facts plausibly establishing that any "electronic communications" as defined under the Act were intercepted. Plaintiffs' WESCA claim therefore must be dismissed.

*1. Plaintiffs fail to allege any plausible interception of "contents."*

Like their FSCA claim, Plaintiffs' WESCA claim fails because Plaintiffs have not pled facts showing that the "contents" of any communications were intercepted and disclosed to Facebook or Google. WESCA defines "intercept" to mean the "acquisition of the contents of any wire, electronic or oral communication . . .." 18 PA. CON. STAT. § 5702. "Contents," in turn, means "information concerning the ***substance, purport, or meaning*** of [a] communication." *Id.* (emphasis added). WESCA's narrow definition of "contents" shows that the statute protects the substantive aspects of information exchanges – like the words used during a phone call.

Courts distinguish between "contents" and "record" information. *See Ideal Aerosmith, Inc. v. Acutronic USA, Inc.*, No. 07-1029, 2007 WL 4394447, at *3 (E.D. Pa. Dec. 13, 2007) ("[WESCA] tracks the language set forth in the Federal [Wiretap] Act and has been interpreted identically."). For the same reasons that their federal Wiretap Act and FSCA claims fail as addressed above, Plaintiffs fail to allege necessary facts showing that the substantive "contents" of their (or anyone's) communications have ever been intercepted and transmitted to third parties, including Facebook and Google in violation of WESCA. *See supra Section III(B)(1).*

*2. Plaintiffs fail to allege a "device" was used for any alleged interception.*

Plaintiffs' WESCA claim also fails because the Pixel technology is not a "device" that intercepts communications. 18 PA. CONS. STAT. § 5703(1). Like the FSCA, WESCA provides that an "intercept" is an "acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device." *Id.* § 5702 (emphasis added). "Intercept" therefore "reduces to acquiring certain communications using a device." *Popa*, 52 F.4th at 129. And a "[d]evice," in turn, is expressly defined as "[a]ny device or apparatus . . . that can be used to intercept a wire, electronic, or oral communication" other than things like

telephones, telegraphs, hearing aids, and call-center equipment used for training or quality control. 18 PA. CONS. STAT. § 5702.

As addressed above, courts interpreting "device" in the wiretap context have held that software technology like Facebook's Meta Pixel does not qualify as a "device." *See supra Section III(B)(2).* Indeed, courts have squarely held that a "drive or server on which an e-mail is received does not constitute a device for purposes of the Wiretap Act." *Ideal Aerosmith, Inc.*, 2007 WL 4394447, at *4. And if a drive or server is not a device, then certainly Pixel technology is not. The Court should follow the reasoning of these courts and similarly hold that Plaintiffs' allegations concerning the Pixel technology are insufficient to state a claim for relief under WESCA.

*3. Plaintiffs fail to allege that any electronic communications were intercepted.*

Plaintiffs' WESCA claim also fails because the communications Plaintiffs allege are tracked and intercepted by Pixel technology are not "electronic communications" under WESCA. *See, e.g.,* Am. Compl. ¶ 8 (alleging generically that Aspen Dental "installed tracking pixels and other technologies on its Site in order to collect and disclose Private information to third parties"). Like the FSCA, WESCA exempts from the definition of "electronic communication" any "communication from a tracking device," which is "[a]n electronic or mechanical device which permits only the tracking of the movement of a person or object." 18 PA. CONS STAT. § 5702.

For the same reasons that their FSCA claim fails, Plaintiffs' Amended Complaint fails to allege necessary facts showing that any "electronic communications" have ever been intercepted and transmitted to Pixel technologies such as Facebook and Google in violation of WESCA. *See supra Section III(B)(3).*

*4. Plaintiffs fail to allege any interception took place in Pennsylvania.*

Plaintiffs' WESCA claim also fails because they have not pled facts showing that any alleged interception took place in Pennsylvania. WESCA does not apply to conduct that occurs wholly outside the state of Pennsylvania. *Popa*, 52 F.4th at 130. In declining to extend WESCA to any conduct occurring outside of Pennsylvania, the Superior Court of Pennsylvania has held that: "we, as the courts of this Commonwealth, have no power to control the activities that occur within a sister state . . .. Pennsylvania has no state interest in a recording of a telephone conversation placed in New York, even if the recording is later used in the Pennsylvania Courts." *Larrison,* 750 A.2d 898; *see also Ball v. Ehlig*, 70 Pa. D. & C.4th 160 (Ct. Common Pls. Montgomery Cty., Pa. 2005) (finding Pennsylvania law did not apply where Defendants were situated in Texas, and all relevant conduct relating to the recording occurred in Texas); *Broughal v. First Wachovia Corp.*, 14 Pa. D. & C. 4th 525, 532–33 (Ct. Common Pls. Northampton Cnty., Pa. 1992) (finding that "under Pennsylvania law of torts, foreign interception and recording of a conversation cannot form the basis for a civil Complaint for unlawful interception under this Pennsylvania statute."). As such, WESCA does not apply to interceptions that occur outside of Pennsylvania.

Here, Plaintiffs fail to allege facts showing that the substantive contents of their (or anyone's) communications were intercepted within Pennsylvania. Though Plaintiff C.A. alleges to be a Pennsylvania resident, their allegations are silent as to where any alleged interception occurred. Am. Compl. ¶ 638 (alleging merely that Plaintiff C.A. "used Defendant's website from Pennsylvania."); *Robinson*, 679 F. App'x 132 (affirming the dismissal of plaintiff's claims because the plaintiff failed to allege specific facts sufficient to raise a right to relief "above a speculative level"). On the face of the Amended Complaint, there is no way for the Court to discern whether

any interception occurred within Pennsylvania as required by WESCA. Plaintiffs' Amended Complaint therefore should be dismissed for this additional reason.

**D. Plaintiffs Fail to Allege a Cause of Action under the Massachusetts Wiretap Act (Count X).**

The Massachusetts Wiretap Act ("MWA") provides for a private, civil cause of action to any aggrieved person whose wire communications were secretly intercepted, disclosed, or used, except as permitted or authorized by the Massachusetts Legislature. M.G.L. c. 272 § 99(Q). To state a claim under the Wiretap Act, a plaintiff must plead sufficient facts to plausibly allege that a defendant (1) through the use of an "intercepting device;" (2) willfully and secretly; (3) hear, record, or aid another to secretly hear or record; (4) the "contents;" (5) of a "wire communication;" (6) without the consent of all parties to the communication. *Id.* at 272 § 99(C)(1), (Q).

For each of the following independent reasons, Plaintiffs fail to plausibly allege facts to show that they are entitled to any relief.

*1. Plaintiffs fail to allege that an "intercepting device" was used.*

Under the MWA, an "intercepting device" "means any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire or oral communications . . . other than any telephone or telegraph instrument, equipment, facility, or a component thereof . . . being used by a communications common carrier in the ordinary course of its business." M.G.L. c. 272 § 99(B)(3). Like Plaintiffs' FSCA and WESCA claims, Plaintiffs' MWA claim fails because Pixel technology is not a "device" in the wiretap context. *See supra Sections III(B)(2) and III(C)(2).*

*2. Plaintiffs fail to allege that an interception occurred in Massachusetts.*

Plaintiffs do not allege that Aspen Dental intercepted, disclosed, or used their communications in the state of Massachusetts. Thus, Plaintiff's MWA claim necessarily fails

because, like WESCA, the MWA only applies to interceptions that occur in Massachusetts. *See MacNeill Eng'g Co. v. Trisport Ltd*., 59 F. Supp. 2d 199, 202 (D. Mass. 1999) (holding "secretly recording a conversation outside Massachusetts does not give rise to liability under Section 99Q even if the call originated within Massachusetts"); *Commonwealth v. Wilcox*, 823 N.E.2d 808, 815 (Mass. App. Ct. 2005) (holding MWA did not apply to videotape recorded in Rhode Island), *aff'd*, 841 N.E.2d 1240 (Mass. 2006). In *Marquis v. Google, Inc.*, the court dismissed an MWA claim arising out of Google's conduct of scanning user emails for advertising purposes because the scanning processes at issue were "implemented on servers [physically] located outside of Massachusetts." No. 11-2808, 2015 WL 13037257, at *3, *7 (Mass. Super. Ct. Feb. 13, 2015) (reasoning "nothing in the wiretap statute suggests any intention to regulate conduct outside the bounds of the Commonwealth" and noting it would not make sense to interpret statute as applying to out-of-state conduct given that other states' laws permit one-party consent to record conversations). Plaintiffs A.O. and S.B. allege only that they reside in Massachusetts and they "used Defendant's Website from Massachusetts" Am. Compl. ¶ 562. Plaintiffs A.O. and S.B. do not, however, allege the technological processes involved in the purported interception, disclosure, or use at issue took place in Massachusetts. Accordingly, for this additional reason, they fail to state a MWA claim. *See Christenson v. Cox*, No. SUCV201701635BLS1, 2017 WL 7053911, at *7 (Mass. Super. Ct. Nov. 21, 2017) (dismissing MWA claim where plaintiff did not allege defendant was in Massachusetts when he made the secret recording at issue).

*3. Plaintiffs fail to plausibly allege that any "interception" was secretly heard or recorded.*

The MWA defines "interception" as "to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to

such communication." M.G.L. c. 272 § 99(B)(4). In addressing the meaning of "secrecy" under the Act, the Massachusetts Supreme Court has held that it means a lack of actual notice or notice of the act of recording or hearing. *Curatone v. Barstool Sports, Inc.*, 487 Mass. 655, 658-59 (2021); *see also Com. v. Alleyne*, 474 Mass. 771, 785 (2016); *Com. v. Morganti*, 455 Mass. 388, 401 (2009); *Com. v. Boyarsky*, 452 Mass. 700, 705 (2008). As a matter of law, express permission or consent to hear/record the communication is not required. *Id.* Moreover, it is the act of hearing or recording that must be secret to constitute a potentially unlawful interception—not the identity of the person who is hearing/recording or what one does with the recording or information obtained. *Curatone*, 487 Mass. at 656-57 (granting motion to dismiss and holding that where act of recording itself was not secret, even when the identity of the listener/recorder was intentionally falsified and kept secret, there could be no unlawful interception under the Wiretap Act). As discussed more fully below with regard to Plaintiffs' ICFA claim, Aspen Dental specifically disclosed to Plaintiffs A.O. and S.B. (and other website users) that it tracked users' browser activities on its public website using cookies and other technology. *Infra Section IV(A)(1).*

*4. The ordinary course of business exception to the MWA applies here.*

Plaintiffs' MWA claim also fails because activities undertaken in the ordinary course of business are intentionally excluded from the statutory definition of an unlawful "interception." *See* M.G.L. ch. 272 § 99(B)(3) (creating an exception for "any telephone or telegraph instrument, equipment, facility, or a component thereof, (a) furnished to a subscriber or user by a communications common carrier in the ordinary course of its business under its tariff and being used by the subscriber or user in the ordinary course of its business ...."); *see also* M.G.L. ch. 272 § 99(D)(l)(b) (using an office intercommunication system in the ordinary course of business is not an unlawful interception). The MWA was intended to address extraordinary or unanticipated

recording of communications, not those used in everyday business operations. As such Massachusetts courts have applied the "ordinary course of business" exception to recording systems used for a legitimate business purpose. *See Dillon v. Mass. Bay Transp. Auth.,* 729 N.E.2d 329, 336 (Mass. App. Ct. 2000) (holding that even though employees had personal calls recorded by company's recording system, it was an "unavoidable byproduct or consequence" of the continuous recording, and "tolerable" if the main system was lawful); *O'Sullivan v. NYNEX Corp*, 687 N.E.2d 1241, 1246 (Mass. 1997) (holding there was a legitimate business interest in "managing and monitoring the quality of telephone calls made by their telemarketers to NYNEX customers."). Here, Plaintiffs allege that Pixel and similar technologies were used in the ordinary course of Aspen Dental's business as part of Aspen Dental's website operations. *See, e.g.,* Am. Compl. ¶ 8. The Court should find that the ordinary course of business exception to the MWA applies to the conduct alleged in the Amended Complaint and dismiss Plaintiffs' MWA claim for this reason as well.

### E. Plaintiffs' California Invasion of Privacy Act Must Be Dismissed (Count XII).

California Penal Code Section 631 ("CIPA") is California's anti-wiretapping and anti-eavesdropping statute. Section 631(a) imposes liability on any "person" who: (1) "by means of any machine, instrument, or contrivance, or in any other manner, intentionally taps, or makes any unauthorized connection … with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system"; or (2) "willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state"; or (3) "attempts to use, in any manner, or for any

purpose, or to communicate in any way, any information so obtained"; or (4) "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above."

Plaintiffs' CIPA claim fails because: (1) Plaintiffs fail to allege facts showing that "contents" of communications are at issue; and (2) Pixel technology does not intercept communications "in transit."

1. *Plaintiffs do not plead facts showing that "content information" was disclosed to Pixel technologies.*

Like their FCSA, and WESCA claims, Plaintiffs' CIPA claim fails because they have not alleged facts showing that the substantive contents of their communications were transmitted to Pixel technologies, including Facebook and Google. Plaintiff C.M.'s recitation of the legal conclusion that Aspen Dental and Pixel technology "use Pixels and/or Google Analytics to wiretap California consumers of Aspen's website" (Am. Compl. ¶ 599), is insufficient as a matter of law. *See Supra Sections III(B)(1) and III(C)(1).* Accordingly, Plaintiffs' allegations do not constitute "content information" under CIPA.

2. *Pixel technology does not intercept communications "in transit."*

Plaintiffs do not—and cannot—plead facts showing that Facebook or Google intercepted any communication while it was "in transit," as required by the second clause of CIPA section 631(a). The *Smith* court has held that nearly identical allegations about technologies that caused browsing information to be sent from a user's browser to Facebook did: "…not establish that the Healthcare Defendants 'send' information to Facebook...More accurately, they embed code that creates a new connection between a visitor's browser and a Facebook server. The website's decision to embed the code allows that connection to occur, but the connection happens independently..." *Smith*, 262 F. Supp. 3d at 951. Rather than an interception, two separate

communications occur—one between Aspen Dental's website and the user's browser, and one between the user's browser and Facebook or Google. No communication is being intercepted in transit. *Id.*

## IV. Plaintiffs' State Consumer Protection Act Claims Should Be Dismissed.

Counts VI, IX, XI and XIV allege violations of state consumer protection acts. Am. Compl. ¶¶ 489-518 (Illinois Consumer Fraud and Deceptive Business Practices Act); *id.* at ¶¶ 559-573 (Massachusetts Consumer Protection Act); *id.* at ¶¶ 583-593 (Washington Consumer Protection Act); *id.* ¶¶ 613-632 (California Unfair Competition Law). These claims do not state a claim for relief that can be granted and should be dismissed under Rule 12(b)(6) for the reasons stated below.

### A. Plaintiffs Fail to Allege a Cause of action under the Illinois Consumer Fraud and Deceptive Business Practices Act (Count VI).

Count VI of Plaintiff's Amended Complaint brings a claim under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"). Am. Compl. ¶¶ 489-518. This count, in turn also contains two distinct theories of liability. *First*, Plaintiffs allege Aspen Dental engaged in "deceptive business practices." *Id.* at ¶ 462. *Second*, plaintiffs plead a claim for alleged "unfair acts and practices." *Id.* at ¶ 442. Both of Plaintiffs' claims appear to be grounded in Aspen Dental's alleged use of Pixel technology, resulting in their receipt of targeted marketing. *Id.* at ¶ 446.

To plead a successful ICFA claim, a plaintiff must allege facts plausibly showing "that the defendant committed a deceptive or unfair act with the intent that others rely on the deception, that the act occurred in the course of trade or commerce, and that it caused actual damages. *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 646 (7th Cir. 2019) (internal citation omitted). Plaintiffs' ICFA claims do not satisfy these requirements.

#### *1. Plaintiffs' deceptive practices claim fails to allege deception or personal deception.*

As an initial matter, Plaintiffs' deceptive practices should also be dismissed for failure to adequately allege how any statement Aspen Dental made is deceptive under Rule 9(b). *Troutt v. Mondelez Global LLC*, No. 21-cv-01279-SPM, 2022 WL 16552956, at *3 (N.D. Ill. Oct. 31, 2022) ("As this claim relates to deceptive conduct (as opposed to unfair conduct), the heightened pleading standard in [Rule 9(b)] applies.").

As the Illinois Appellate Court has held: "The bald assertion of deception is insufficient to state a claim; the deceptive manner of the omission must be stated with specificity and particularity." *Rockford Memorial Hosp. v. Havrilesko*, 368 Ill. App. 3d 115, 123 (2d Dist. 2006); *see also, e.g., White v. DaimlerChrysler Corp*., 368 Ill. App. 3d 278, 283 (1st Dist. 2006) ("A complaint alleging a consumer fraud violation must be pled with the same particularity and specificity as that required under common law fraud.").

Moreover, the Illinois Supreme Court has held, repeatedly, that a plaintiff must allege that she has ***personally*** been deceived to state an ICFA claim. *See De Bouse v. Bayer*, 235 Ill. 2d 544, 550 (2009) (collecting cases; "[W]e have repeatedly emphasized that in a consumer fraud action, the plaintiff must actually be deceived by a statement or omission. If there has been no communication with the plaintiff, there have been no statements and no omissions. In such a situation, a plaintiff cannot prove proximate cause."); *Oliveira v. Amoco Oil Co.*, 201 Ill. 2d 134, 155 (2002) ("[T]o properly plead the element of proximate causation in a private cause of action for deceptive advertising brought under the Act, a plaintiff must allege that he was, in some manner, deceived.").

Plaintiffs' Amended Complaint contains pages of allegations regarding their individual claims. Am. Compl. ¶¶ 300-382. However, Plaintiffs have not alleged that they were ***personally*** deceived by any of Aspen Dental's alleged deceptions. Thus, Plaintiffs' ICFA claim grounded in

alleged deceptive acts or practices should be dismissed for this reason alone. *See Oliveira*, 201 Ill. 2d at 155 (affirming dismissal; "Because plaintiff does not allege that he saw, heard or read any of defendant's ads, plaintiff cannot allege that he believed that he was buying gasoline which benefitted the environment or improved engine performance.").

*2. Plaintiffs do not allege an actual, pecuniary loss under any theory.*

Plaintiffs' ICFA claim also fails, for both alleged consumer unfairness and for alleged consumer deception, because they do not allege actual damages. As the Illinois Supreme Court held: "Unlike an action brought by the Attorney General under section 2, which does not require that 'any person has in fact been misled, deceived or damaged,' (815 ILCS 505/2 (West 1996)), a private cause of action under section 10(a) requires proof of 'actual damage' (815 ILCS 505/10a(a))." *Oliviera,* 201 Ill.2d at 149; *see also, e.g., Benson*, 944 F.3d at 647 (same). This requires "actual pecuniary loss." *See Washington v. Hyatt Hotels Corp*., No. 1:19-cv-04724, 2020 WL 3058118, at *7 (N.D. Ill. June 9, 2020) ("[u]nder the ICFA, a plaintiff must plead actual pecuniary loss"); *Benson*, 944 F.3d at 647 ("must plausibly plead that the deceptive or unfair act caused her to suffer actual damages, meaning pecuniary loss"); *see also Khorloo v. John C. Heath Attorney at Law, PLLC*, No. 18-cv-01778, 2020 WL 1530735, at *2 (N.D. Ill. Mar. 31, 2020) (quoting *Kim v. Carter's Inc*., 598 F.3d 362, 365 (7th Cir. 2010) (same).

Plaintiffs cannot meet this requirement under either prong of their statutory claims because Plaintiffs A.D., R.G., C.C. and K.F. do not allege *any* damages that are specific to themselves. Am. Compl. ¶¶ 300-382. Rather, they merely make generic allegations of damages that Plaintiffs and putative class members have overpaid for their health care services, suffered a diminished value of their personal information, and that Aspen Dental "harmed" their privacy interest. Am. Compl. ¶¶ 516-517. Yet the use of Aspen Dental's public website is free. Thus, the only actual

loss that Plaintiffs allege anyone has suffered is an alleged loss of privacy, which is not the purview of the ICFA. *See Khorloo*, 2020 WL 1530735, at *2 (rejecting ICFA claim for damages based on alleged loss of privacy; "It seems unlikely that the statute allows plaintiffs to recover damages for privacy violations because the ICFA is concerned with fraudulent or unfair advertising, not with individual privacy rights.").

Moreover, even outside this context, the Seventh Circuit has repeatedly rejected each of Plaintiffs' damages theories as being cognizable, even to provide federal standing to sue, including most recently in *Dinerstein v. Google, LLC*, 73 F.4th 502, 517-18 (7th Cir. 2023) (benefit of the bargain ("overpayment") and loss value); *Gubala v. Time Warner Cable, Inc.*, 846 F.3d 909, 912-13 (7th Cir. 2017) (claimed lost property value of personal information; "This is gibberish."); *Remijas v. Nieman Marcus Grp., LLC*, 794 F.3d 688, 694-95 (7th Cir. 2015) (stating "we are dubious" that overpayment theory could provide standing in data security case; distinguishing prior case law because "[i]mportantly, many of those cases involve products liability claims against defective or dangerous products"); *Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963, 969 (7th Cir. 2016) (same); *Dieffenbach v. Barnes & Noble, Inc.*, 887 F.3d 826, 829 (7th Cir. 2018) (rejecting claim for overpayment damages where plaintiff "does not contend that any of the items she purchased was defective or that Barnes & Noble promises any particular level of security, for which she paid").

*3. Plaintiffs cannot establish an ICFA claim based on the Illinois Personal Information Protection Act.*

Lastly, Plaintiffs attempt to shoehorn an alleged violation of the Illinois Personal Information Protection Act ("PIPA") into an ICFA violation. Am. Compl. ¶¶ 501-506. But PIPA applies to data breaches. *See* 815 ILCS 530/5 (defining "Breach of the security of the system data" or "breach" to mean "unauthorized acquisition of computerized data that compromises the

security, confidentiality, or integrity of personal information maintained by the data collector"); *accord Ramirez v. LexisNexis Risk Sols.*, No. 22 C 5384, 2024 WL 1521448, at *5(N.D. Ill. Apr. 8, 2024) (holding PIPA did not prohibit defendant from collecting and tracking data in online database of public and non-public consumer information).

### B. Plaintiffs' Massachusetts Consumer Protection Act Claim Fails (Count IX).

To state a claim under the Massachusetts Consumer Protection Act ("Chapter 93A"), Plaintiffs must plausibly allege: (1) an unfair or deceptive act that (2) caused her injury or loss. *See Jones v. Experion Info. Solutions, Inc.*, 141 F. Supp. 3d 159, 163 (D. Mass. 2015). Where a plaintiff's Chapter 93A claim is premised on alleged misrepresentations by the defendant (Am. Compl. ¶¶ 565-566), the particularity requirements of Federal Rule of Civil Procedure 9(b) apply. *Mulder v. Kohl's Dep't Stores, Inc.*, 865 F.3d 17, 21-22 (1st Cir. 2017). This requires the plaintiff to "specifically plead the time, place, and content" of the misconduct alleged. *Id.* (citations omitted).

#### 1. *Plaintiffs fail to allege an unfair or deceptive act.*

Plaintiffs fail to allege Aspen Dental committed an unfair act within the meaning of Chapter 93A. Pursuant to Chapter 93A, an act is unfair "if it is (1) within the penumbra of common law, statutory, or other established concept of unfairness; (2) immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to [consumers,] competitors or other business people." *Tomasella v. Nestle USA, Inc.*, 962 F.3d 60, 79 (1st Cir. 2020). Plaintiffs' A.O and S.B. allege Aspen Dental disclosed their information to third parties to facilitate marketing to Plaintiffs without consent. Am. Compl. ¶¶ 341, 382. But Plaintiffs A.O. and S.B. do not allege facts suggesting that targeted advertising is within an established common law or statutory concept of unfairness or is otherwise immoral, unethical, oppressive, or unscrupulous; there are no allegations

explaining how it causes or even could cause substantial injuries to consumers. Targeted advertising is ubiquitous, and reasonable consumers continue to engage with websites that use similar tools every day. Plaintiffs' assertion that the practices at issue are unfair under Chapter 93A are thus conclusory and should be disregarded. *See Valley Children's Hospital v. Athenahealth, Inc.*, 22-cv-10689-DJC, 2023 WL 6065800, at *4 (D. Mass. Sept. 18, 2023) (dismissing Chapter 93A claim where no factual allegations suggesting alleged conduct "rose to the 'level of rascality' or had the 'requisite extortionate quality' necessary to constitute a violation of Chapter 93A."). Similarly, the practices at issue are not deceptive. Under Chapter 93A, an act is deceptive if it would mislead a consumer acting reasonably under the circumstances and cause them to act differently than they otherwise would have acted. *Lyons v. Fed. Nat'l Mortg. Ass'n*, No. 1:18-cv-10365-ADB, 2019 WL 1230364, at *3 (D. Mass. Mar. 15, 2019). As discussed above, Aspen Dental discloses its use of Pixel technology in its website Privacy Policy. *See supra Section IV(A)(1).* Thus, Plaintiffs Chapter 93A claim should be dismissed for lack of actual deception.

2. *Plaintiffs fail to allege injury or loss.*

Moreover, the unfair or deceptive act must have caused the plaintiff injury or loss. *Hershenow v. Enter. Rent-A-Car Co. of Bos. Inc.*, 840 N.E.2d 526, 533 (Mass. 2006). "[T]he plaintiff must allege that she has suffered an 'identifiable harm' caused by the unfair or deceptive act that is separate from the violation itself." *Shaulis v. Nordstrom, Inc.*, 865 F.3d 1, 10 (1st Cir. 2017); *see Brown v. Bank of Am., N.A.*, 67 F. Supp. 3d 508, 514 (D. Mass. 2014) (granting motion to dismiss Chapter 93A claim as plaintiff's "conclusory assertion of emotional distress f[ell] short of establishing economic injury"). Like Plaintiffs' ICFA claim, Plaintiffs' 93A claim fails because Plaintiffs never alleged injury. *See supra Section IV(A)(2).* Plaintiffs A.O. and S.B. offer only conclusory allegations regarding the injuries they suffered, which are insufficient to survive a

motion to dismiss. *See Shaulis*, 865 F.3d at 13 (affirming dismissal of Chapter 93A claim where plaintiff failed to allege "real loss grounded in some objective measure"). Moreover, Plaintiffs A.O. and S.B. never claim that they saw any of the allegedly unfair or deceptive statements at issue, so those statements could not have caused them harm. *See Roberts v. Enter. Rent-A-Car Co. of Bos.,* 840 N.E.2d 541, 543 (Mass. 2006).

3. *Plaintiffs fail to provide adequate notice of Chapter 93A.*

Lastly, Plaintiffs failed to send a 93A demand letter identifying Plaintiffs. *See* M.G.L. ch. 93A, § 9(3) (providing that the demand letter must "identify[] the claimant"). This is fatal to Plaintiffs' Chapter 93A claim. *See Alberts v. Payless Shoesource, Inc.*, 13–12262–GAO, 2014 WL 4924243, at *1 (D. Mass. Sept. 29, 2014) (dismissing Chapter 93A claim where demand letter failed to identify claimant by referring to her only as "Plaintiff" and "my client").

**C. Plaintiffs' Washington Consumer Protection Act Claim Fails (Count XI).**

To state a Washington Consumer Protection Act ("CPA") claim, Plaintiffs must allege facts establishing "(1) an unfair or deceptive act or practice that (2) affects trade or commerce and (3) impacts the public interest, and (4) [that Plaintiffs] sustained damage to business or property that was (5) caused by the unfair or deceptive act or practice." *Keodalah v. Allstate Ins. Co*., 194 Wn.2d 339, 349–50 (2019). Plaintiffs' CPA claim fails for two reasons: (1) Plaintiffs fail to allege injury; and (2) Plaintiffs fail to allege causation.

First, to state a claim under the CPA, there "must be an injury to 'business or property.'" *Ambach v. French*, 167 Wn. 2d 167, 171–72 (2009). "Business or property" as used in the CPA "denote[s] a commercial venture or enterprise." *Id.* at 172. A cognizable injury "is established when a plaintiff is deprived of the use of his property as a result of an unfair or deceptive act or practice." *Sorrel v. Eagle Healthcare, Inc.*, 110 Wn. App. 290, 298 (2002). Like Plaintiffs' ICFA

and Chapter 93A claims, Plaintiff E.W.'s CPA claim fails because they have not alleged *any* specific damages (Am. Compl. ¶¶ 321-327) and the generic allegations that apply to the putative class, i.e., overpayment, diminished value of personal information, injury to a purported privacy interest are insufficient to state a claim. and that Aspen Dental "harmed" their privacy interest *id.* at ¶¶ 516-517. "[A]n invasion of privacy is a 'personal' injury, rather than a 'business or property' injury, because the concept of privacy by its very nature is inherently personal, not pecuniary." *Gragg v. Orange Cab Co.*, Inc., 942 F. Supp. 2d 1111, 1118–19 (W.D. Wash. 2013) (dismissing CPA claim where alleged injury was privacy violation). And "[p]ersonal injuries, as opposed to injuries to 'business or property,' are not compensable and do not satisfy the injury requirement" under the CPA. *Panag v. Farmers Ins. Co. of Wash.*, 166 Wn.2d 27, 57 (2009).

Second, the CPA's causation element requires a "plaintiff [to] establish that, but for the defendant's unfair or deceptive practice, the plaintiff would not have suffered an injury." *See, e.g., Indoor Billboard/ Wash., Inc. v. Integra Telecom of Wash., Inc.*, 162 Wn.2d 59, 84 (2007). Plaintiff E.W. fails to make any such allegation. They allege using Aspen Dental's website for their own benefit, to gather information. *See* Am. Compl. ¶¶ 321-327. They do not allege they used the website because of any representation Aspen Dental made regarding the safeguarding of their website traffic. *See Woodell v. Expedia Inc*., C19-0051JLR, 2019 WL 3287896, *11–12 (W.D. Wash. 2019) (dismissing where complaint failed to plead allegedly deceptive conduct affected decision to purchase from defendant).

### D. Plaintiffs Have Failed to State Claim Under California's Unfair Competition Law (Count XIV).

Plaintiffs' UCL claim fails for two reasons. First, because Plaintiffs have failed to state facts showing their personal information was disclosed to any third party, they have failed to

establish any "unlawful, unfair, or fraudulent" business practice under California Business and Professions Code section 17200.

Second, because Plaintiffs have failed to state facts showing how anything Aspen Dental did (or did not do) caused them any loss of money or property, "as required for UCL standing," their UCL claim fails. *See Kwikset Corp. v. Super. Ct.*, 51 Cal.4th 310, 322 (2011). In *Doe v. Meta Platforms, Inc.*, No. 22-CV-03580-WHO, 2023 WL 5837443, at *15 (N.D. Cal. Sept. 7, 2023), a lawsuit against Meta regarding the use of the Meta Pixel on hospital websites, the Court rejected the argument that the plaintiff had alleged loss of money or property under the UCL because "of the failure to separately allege a benefit of the bargain basis for 'loss of money or property' under the UCL and in light of the inconsistent allegations how plaintiffs could and would participate in a legitimate market for health care information." Id. at *15-17 (emphasis original).

## V. Plaintiffs' California Confidentiality of Medical Information Act Should Be Dismissed (Count XIII).

Plaintiffs' CMIA claim should be dismissed for two independent reasons: (1) Plaintiffs fail to plead facts showing any medical information or medical records have been transmitted; and (2) Plaintiffs fail to allege facts showing that anyone at any third party actually improperly viewed or accessed any medical information.

### *1. Plaintiffs have not alleged their medical information or medical records have been transmitted.*

Plaintiffs' CMIA claim should be dismissed because Plaintiffs failed to plead facts sufficient to show that any of their alleged medical information was transmitted to Pixel technologies. All Plaintiff C.M. alleges about ***themself*** is that they were an Aspen Dental patient and used Aspen Dental's website to "research conditions, treatments, and dental healthcare providers, and schedule appointments." Am. Compl. ¶ 356. Plaintiff C.M. also alleges that they

provided "first and last name, birth date, email address, phone number, and reason for visit." *Id.* at ¶ 357.

Most importantly, Plaintiffs plead facts regarding only their activities on Aspen Dental's public website, which is insufficient to state a claim. *Smith v. Facebook*, 262 F. Supp. 3d 943, 954-55, *aff'd*, 745 F. App'x 8 (9th Cir. 2018) (holding that disclosure to Facebook of browsing history on healthcare providers' public websites, as alleged here, did not disclose PHI because "[t]hese pages contain general health information that is accessible to the public at large"). "Information available on publicly accessible websites stands in stark contrast to the personally identifiable patient records and medical histories protected by these statutes— information that unequivocally provides a window into an individual's personal medical history." *Id.*

The *Smith* court held that the type of information allegedly at issue here is not "medical information":

> The URLs at issue … point to pages containing information about treatment options for melanoma, information about a specific doctor, search results related to the phrase 'intestine transplant,' a wife's blog post about her husband's cancer diagnosis, and other publicly available medical information. … These pages contain general health information that is accessible to the public at large. The same pages are available to every computer, tablet, smartphone, or automated crawler that sends GET requests to these URLs. Nothing about the URLs, or the content of the pages located at those URLs, relates to the past, present, or future physical or mental health or condition of an individual.

*Id.* (dismissing CMIA claim). The Ninth Circuit affirmed the Smith court, similarly stating: "The data show only that Plaintiffs searched and viewed publicly available health information that cannot, in and of itself, reveal details of an individual's health status or medical information." *Smith v. Facebook*, 745 F. App'x 8, 9.

As for Plaintiff C.M.'s allegations related to scheduling appointments (*e.g.,* Am. Compl. ¶¶ 356-357), at most, Plaintiffs have alleged the disclosure of the fact that they may have been an

Aspen Dental patient. But "the fact that he or she was a patient is not in itself medical information." *Eisenhower Med. Ctr. v. Super. Ct.*, 226 Cal. App. 4th 430, 436 (2014). This court's recent decision in *Kurowski* is instructive: "[Plaintiff] fails to allege the disclosure of any information related to the provision of treatment to her or other similarly situated Rush patients." *Kurowski*, 2023 WL 2349606, at *6. "[Plaintiff] has not alleged sufficient facts, however, to support an inference that Rush disclosed its patients' individually identifiable health information, at least as that term is defined by the statute.… Moreover, the hypotheticals provided by Kurowski appear to illustrate only what occurs when an individual—whether a patient or not—clicks on certain areas of Rush's public website." *Id.* at *5. Plaintiffs' similarly insufficient allegations do not establish that any "medical information" was disclosed.

*2. Plaintiffs fail to allege facts showing that anyone actually viewed or accessed medical information.*

Separately, to state a CMIA claim, a plaintiff must plead "that the information was improperly viewed or otherwise accessed." *See, e.g., Stasi v. Immediate Health Grp. Corp.*, 501 F. Supp. 898, 922-23 (S.D. Cal. 2020). Here, Plaintiffs have alleged only that the data at issue was channeled through Pixel technology coding or computer systems. *See, e.g.,* Am. Compl. ¶¶ 12, 80, 84. This allegation is insufficient to state a claim. *Sutter Health v. Super. Ct.*, 227 Cal. App. 4th 1546, 1553 (2014) (no claim under CMIA when there was no allegation that anyone ever viewed medical information that was exposed in a data breach); *Regents of Cal. v. Super. Ct.*, 220 Cal. App. 4th 549, 570 (2013) (finding patient did not state a claim under the CMIA because "she cannot allege her medical records were, in fact, viewed by an unauthorized individual."). There similarly is not allegation that any *person* at Facebook or Google has viewed Plaintiffs' data. As in *Sutter Health*, Plaintiffs' CMIA claim should be dismissed.

## VI. Plaintiffs' Common Law Claims Fail to State Causes of Action.

In addition to their statutory claims, Plaintiffs allege four claims under Illinois common law: negligence (Am. Compl. ¶¶ 439-448); invasion of privacy (*id.* at ¶¶ 449-464); unjust enrichment (*id.* at ¶¶ 465-471); and breach of implied contract (*id.* at ¶¶ 472-488).

### A. Plaintiffs' Negligence Claim is Based on Breach of Physician-Patient Confidentiality and Should Be Dismissed (Count II).

The basis for Plaintiffs' negligence claim, is that Aspen Dental had a duty to maintain the confidentiality of their personal health information. Am. Compl. ¶ 444 ("Defendant had a duty under HIPAA privacy laws, which were enacted with the objective of protecting the confidentiality of clients' healthcare information and set forth the conditions under which such information can be used, and to whom it can be disclosed."). Stated more plainly, the core of Plaintiffs' negligence claim is a common law claim under Illinois law grounded in an alleged breach of physician-patient confidentiality.

Illinois, however, has not recognized an independent tort claim for breach of physician-patient confidentiality under Illinois common law. Chief Judge Pallmeyer specifically declined the invitation to recognize the claim in *Dinerstein*, explaining that the Seventh Circuit "consistently ha[s] held that it is not [a district court's] role to break new ground in state law." *Dinerstein*, 484 F. Supp. 3d at 594-95 (citing *Sabrina Roppo v. Travelers Com. Ins. Co.*, 869 F.3d 568, 596 (7th Cir. 2017)) (internal quotation marks omitted). The Seventh Circuit affirmed the decision on standing grounds but also did not disagree with this conclusion: "[W]e see no reason to disturb the judge's decision not to recognize a novel claim for breach of medical confidentiality. Illinois Courts have not yet weighed in on the issue, and it is not our role to breach new ground in state law." *Dinerstein*, 73 F.4th at 523, n. 4 (quotation omitted).

The Court should reach the same conclusion here and dismiss Plaintiffs' negligence claim with prejudice. *See also Kurowski v. Rush System for Health*, --- F.Supp.3d ----, 2023 WL 4707184, at *5 (N.D. Ill. July 24, 2023) ("As far as the Court is aware, a common law cause of action for breach of confidentiality remains unavailable in Illinois, and Kurowski has not offered any justification for the Court to 'breach new ground' here by recognizing one.").

**B. Plaintiffs Do Not Allege the Publicity Requirement for a Public Disclosure of Private Facts Claim (Count III).**

The fundamental element of a claim for invasion of privacy by public disclosure of private facts claim under Illinois law is "publicity," *i.e.*, that plaintiffs' private information has in fact been made public, or at the very least that the plaintiff "has a special relationship with the 'public' to whom the information is disclosed." *Miller v. Motorala*, 202 Ill. App. 3d 976, 981 (1st Dist. 1990).

Generally speaking, "'[p]ublicity' in this invasion of privacy tort means communicating the matter to the public at large or to so many persons that the matter must be regarded as one of general knowledge." *Roehrborn v. Lambert*, 277 Ill. App. 3d 181, 184 (1995) (quoting Restatement (Second) of Torts, § 652D, comment a, at 384. (1977)); *see also Beverly v. Reinert*, 239 Ill. App. 3d 91, 99 (1992) (same).

The basis for Plaintiffs' claim is that Aspen Dental allegedly disclosed their information to ten third parties, including Facebook and Google, not to the public at large, or to any third parties with whom they had a special relationship. Am. Compl. ¶ 8. Notably, Plaintiffs do not attempt to plead facts to meet this requirement, instead basing the claim on the mere fact of publication alone, as if this were a defamation claim. *Id.* at ¶ 453; *Kurowksi*, 2023 WL 4704184, at *9 (dismissing plaintiff's publication of private facts claim for failure to allege requisite element of publicity); *but see Roehrborn*, 277 Ill. App. 3d at 184 (analyzing the distinctions between the two claims).

This is not sufficient to state a claim for invasion of privacy by public disclosure of private facts under Illinois law. *See also Hunstein v. Pref. Coll. & Mang't Servs., Inc.*, 248 F.4th 1236, 1245 (11th Cir. 2022) (en banc) (analyzing tort; holding: "the harm at the core of the tort is based on the fact that embarrassing information exists, but that the public knows about it. So without publicity, there can be no tort."); *Colbert v. Nat'l Credit Sys., Inc.*, No. 1:21-cv-02079, 2023 WL 1448104, at *4 (N.D. Ill. Feb. 1, 2023) (same).

### C. Plaintiffs Have Not Adequately Alleged Detriment for their Unjust Enrichment Claim (Count IV).

Count IV of Plaintiffs' Amended Complaint asserts a claim for unjust enrichment. Am. Compl. ¶¶ 465-471. As an initial matter, because unjust enrichment is not a separate cause of action in Illinois, since Plaintiffs' implied breach of contract claim fails (*infra at Section VI(D)*), their unjust enrichment claim must also fail. *See Bakopoulos v. Mars Petcare US, Inc.*, No. 20 CV 6841, 2021 WL 2915215, at *8 (N.D. Ill. July 12, 2021) ("Unjust enrichment is not a separate cause of action under Illinois law" and "if . . . [the] claim rests on the same improper conduct alleged in another claim . . . [it] will stand or fall with the related claim.") (citing *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 739-740 (7th Cir. 2021)). To "state a cause of action for a breach of contract implied in law, a plaintiff must allege specific facts in support of the conclusion that it conferred a benefit upon the defendant which the defendant has unjustly retained in violation of fundamental principles of equity and good conscience." *Marque Medicos Farnsworth, LLC v. Liberty Mut. Ins. Co.*, 2018 IL App (1st) 163351, ¶ 17. Here, Plaintiffs have failed to adequately allege any detriment to support their claim. Instead, Plaintiffs have alleged only that they "conferred a benefit upon Defendant in the form of monetizable Private information." Am. Compl. ¶ 467. Plaintiffs further allege that Aspen Dental should not be "permitted to retain any of the profit or other benefits" acquired from the use of Pixel technology on its website. *Id.* at ¶ 470.

These claims fail to substantiate an unjust enrichment claim. Courts have "routinely rejected the proposition that an individual's personal identifying information has an independent monetary value." *In re Arthur J. Gallagher Data Breach Litig.*, 631 F. Supp. 3d at 591; *Fero v. Excellus Health Plan, Inc.*, 236 F. Supp. 3d 735, 755 (W.D.N.Y. 2017). This is particularly so where, as here, Plaintiffs have alleged that their personal information allegedly has value on certain markets, including alleged "illegal marketplace[s]." Am. Compl. ¶ 288. As one court questioned in rejecting this same alleged theory of injury: "[H]ow is that a value to the plaintiff? How can you say that the value – something that's worth something to somebody else is somehow something that I can take as a value for me?" See Ex. B, *In re Dominion Dental Servs. USA, Inc.*, E.D.Va. No. 1:19-CV-01050, at pg. 18 (Jan. 17, 2020) (Brinkema, J.).

The Southern District of New York made the same point in rejecting an analogous unjust enrichment claim: "While we recognize that browsing information may possess value in the abstract, absent allegations suggesting that plaintiffs' ability to monetize their browsing information was diminished, this alleged harm remains too conjectural." *Mount v. PulsePoint, Inc.*, No. 13 Civ. 6592 (NRB), 2016 WL 5080131, at *6, 13 (S.D.N.Y. Aug. 17, 2016), *aff'd* 684 F. App'x 32, 36 (2d Cir. 2017) ("plaintiffs do not allege that PulsePoint's data collection practices actually deprived them of any opportunity to sell their own personalized information").

### D. Plaintiffs Do Not Adequately Allege an Implied Contract under Illinois Law (Count V).

Count V of Plaintiffs' Amended Complaint asserts a claim for breach of implied contract. Am. Compl. ¶¶ 472-488. Under Illinois law, "[a] contract implied in fact is a 'true contract,' under which the parties set the terms and establish the bounds of their liability." *Matthews v. Chicago Transit Authority*, 2016 IL 117638, ¶ 93 (2016). It must contain "all of the elements of a contract," including "offer, acceptance, and consideration," through which a court can ascertain the requisite

"meeting of the minds." *BMO Harris Bank, N.A. v. Porter*, 2018 IL App (1st) 171308, ¶ 53 (2018); *see also Trapani Const. Co., Inc. v. Elliot Group, Inc.,* 2016 IL App (1st) 143734, ¶ 42 (2016) (same). Plaintiffs' implied contract claim fails for multiple independent reasons.

*First*, Plaintiffs do not allege facts showing any kind of mutual assent (offer and acceptance) to agreed terms. *See La Salle Nat'l Bank v. Inter'l Ltd.*, 129 Ill. App. 2d 381, 394 (2d Dist. 1970) ("If a binding contract is going to come into being – other than a contract implied in law or quasi-contract – it is essential that the parties to the agreement have a meeting of the minds, and that they truly assent to the same things in the same sense on all of its essential terms and conditions."); *see also BMO Harris Bank*, 2018 IL App (1st) 171308 ("[T]he only difference between an express contract and an implied in fact contract is that an implied contract is inferred from the facts and conduct of the parties, rather than from an oral or written agreement.").

*Second*, Plaintiffs fail to allege the existence of a valid contract, supported by mutual assent and consideration. *Young v. Facebook, Inc.*, 790 F. Supp. 2d 1110, 1117 (N.D. Cal. 2011) (dismissing contract claim where plaintiff failed to "allege the specific provisions in the contract creating the obligation the defendant is said to have breached"). Plaintiffs allege the parties entered an implied contract for data security based on the fact that Plaintiffs used Aspen Dental's public website. Am. Compl. ¶ 475. The Court should not credit such vague and conclusory allegations containing no facts as to any contracts, contract terms, or services.

Regardless, there is no indication that the parties contracted to safeguard Plaintiffs' data. *Lovell v. P.F. Chang's China Bistro, Inc.*, No. C14- 1152RSL, 2015 WL 4940371, at *3 (W.D. Wash. Mar. 27, 2015) (dismissing breach of implied contract claim where implied contract could only relate to provision and payment of food, and not data security). To the extent Plaintiffs seek to rely on their subjective understanding there was a contract to safeguard their data, such reliance

would be insufficient. *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 224 (1984) (employee's "subjective understanding that he would be discharged only for cause . . . is insufficient to establish an implied contract to that effect").

**CONCLUSION**

For the reasons and authorities set forth above, Defendant Aspen Dental Management, Inc. respectfully moves the Court to grant its motion to dismiss, with prejudice.

Dated: April 23, 2024

Respectfully submitted,

*/s/ Bonnie Keane DelGobbo*
Joel Griswold
Bonnie Keane DelGobbo
BAKER & HOSTETLER LLP
One North Wacker Drive, Suite 3700
Chicago, Illinois 60606
(312) 416-6200 (phone)
(312) 416-6201 (fax)
jcgriswold@bakerlaw.com
bdelgobbo@bakerlaw.com

Melissa M. Bilancini (*pro hac vice* forthcoming)
Baker & Hostetler LLP
127 Public Square, Suite 2000
Cleveland, Ohio 44114
(216) 621-0200 (phone)
mbilancini@bakerlaw.com

*Attorneys for Defendant*

**CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that on April 23, 2024, a true and correct copy of the foregoing *Defendant Aspen Dental Management, Inc.'s Memorandum in Support of Its Rule 12(b)(6) Motion to Dismiss Plaintiffs' Amended Complaint* was served on counsel of record via the Court's electronic filing system.

*/s/ Bonnie Keane DelGobbo*
Bonnie Keane DelGobbo
*One of the Attorneys for Defendant*

# Exhibit A

FILED
04-18-2024
CLERK OF CIRCUIT COURT
MARATHON COUNTY
2023CV000170

**BY THE COURT:**

**DATE SIGNED: April 15, 2024**

Electronically signed by LaMont K. Jacobson
Circuit Court Judge

| STATE OF WISCONSIN | CIRCUIT COURT<br>BRANCH 3 | MARATHON COUNTY |
|---|---|---|

**RANDY MROZINSKI, et al.**,
Plaintiffs,

vs. Case No. 23-CV-170

**ASPIRUS, INC.**,
Defendant.

## DECISION ON DEFENDANT'S MOTION TO DISMISS

Plaintiffs Randy Mrozinski, Tammy Lowell, and John Doe filed a seven-count class action complaint against Aspirus, Inc., based on the operation of Aspirus's website.[1] The complaint asserted claims for conversion, breach of implied contract, violation of Wis. Stat. §968.31 (wiretapping), breach of the duty of confidentiality, invasion of privacy, unjust enrichment, and violation of the confidentiality of patient health care records. In response, Aspirus filed the pending motion to dismiss, alleging that the complaint fails to state a claim upon which relief can be granted. Having considered the parties' arguments, including their supplemental briefs and related authority, the Court finds that the plaintiffs' first, third, and fourth claims are subject to dismissal, but the others are not.

## ANALYSIS

The Court's role on a motion to dismiss for failure to state a claim is to determine whether the complaint is legally sufficient. *Data Key Partners*

---

[1] The pleading at issue in this decision is the plaintiffs' First Amended Class Action Complaint, filed on August 7, 2023.

*v. Permira Advisers LLC*, 2014 WI 86, ¶19, 356 Wis. 2d 665, 849 N.W.2d 693. A complaint is legally sufficient if it "allege[s] facts that, if true, plausibly suggest a violation of applicable law." *Id.* at ¶21. The Court "accept[s] as true all facts well-pleaded in the complaint and the reasonable inferences therefrom." *Id.* at ¶19. However, "[b]are legal conclusions" should be disregarded. *Id.* at ¶21. A "plaintiff's pleading obligation require[s] 'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action.'" *Id.* at ¶25 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also Cattau v. National Ins. Services of Wis., Inc.*, 2019 WI 46, ¶5, 386 Wis. 2d 515, 926 N.W.2d 756 (quoting *Data Key*, 356 Wis. 2d 665, ¶25). "[T]he pleadings are to be liberally construed to do substantial justice between the parties, and the complaint should be dismissed as legally insufficient only if it appears to a certainty that no relief can be granted under any set of facts that the plaintiff can prove in support of her allegations." *Strid v. Converse*, 111 Wis. 2d 418, 422, 331 N.W.2d 350 (1983).

Applying this framework here, the Court has determined that the claims for conversion, violation of Wis. Stat. §968.31, and breach of the duty of confidentiality are legally deficient, but the other claims have been pleaded sufficiently.

### *1. Conversion*

Conversion has been defined "as 'the wrongful exercise of dominion or control over a chattel.'" *Management Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 206 Wis. 2d 158, 188, 557 N.W.2d 67(1996) (quoting *Production Credit Ass'n v. Nowatski*, 90 Wis. 2d 344, 353–54, 280 N.W.2d 118 (1979)). Or, stated another way, "[c]onversion is the intentional, unauthorized control of another's chattel so as to interfere with the owner's possessory rights." *Midwestern Helicopter, LLC v. Coolbaugh*, 2013 WI App 126, ¶9, 351 Wis. 2d 211, 839 N.W.2d 167. Both formulations of the concept rely on the term "chattel" — but what is a "chattel"?

The term "chattel" is defined as "[m]ovable or transferable property; personal property; esp., a physical object capable of manual delivery and

not the subject matter of real property." Black's Law Dict. 286 (10th ed. 2014). *See also* American Heritage Dict. of the English Language 228 (1980) (defining "chattel" as "[a]n article of personal, movable property"). Thus, a chattel is a physical, tangible item, and conversion is generally concerned with wrongfully interfering with the plaintiff's possession of such an item.

Establishing a claim for conversion requires proof of three elements. "A person is liable for conversion when he or she (1) intentionally controls or takes property belonging to another, (2) without the owner's consent, (3) resulting in serious interference with the owner's rights to possess the property." *Midwestern Helicopter*, 351 Wis. 2d 211, ¶9. "A plaintiff in a conversion action must prove that he [or she] was in possession of or entitled to immediate possession of the chattel that was converted." *Farm Credit Bank of St. Paul v. F&A Dairy*, 165 Wis. 2d 360, 371, 477 N.W.2d 357 (Ct. App. 1991).

Here, Aspirus argued that the plaintiffs have not alleged a claim for conversion because their allegations do not involve chattels. What the plaintiffs alleged that Aspirus converted was their personally identifiable information and protected health information. (First Amended Class Action Complaint, ¶¶362–67.) More specifically, the information at issue consisted information that the plaintiffs typed into their computers while visiting the Aspirus website and locations visited on the website. (*Id.* at ¶¶19–24, 30–36, 48–50.)

In response, the plaintiffs argued that the tort of conversion has been expanded to include other forms of property, including intangible property. They cited a case involving software, arguing that the holding of the case was "that a defendant could be liable for converting intangible property under Wisconsin law." (Plaintiffs' Opposition Brief, p. 23 (citing *Management Computer Servs.,* 206 Wis. 2d 158).) However, they cited no particular passage in that decision, nor did they directly quote from the decision. In fact, the decision actually cuts against the plaintiffs' argument.

The *Management Computer Services* decision specifically defined conversion "as 'the wrongful exercise of dominion or control over a chattel'" (as quoted above). *Management Computer Servs.,* 206 Wis. 2d at 188. Having used the word "chattel" in defining conversion, the court cannot be said to have retreated from the requirement that the property at issue be tangible. The court repeatedly noted that the software had been stored on "back-up tapes" that had been kept at the defendant's premises, and that the defendant had taken the back-up tapes and used them to copy the software. *Id.* at 169–70, 173, 175, 189. Thus, although the conversion claim involved software, it also involved tangible property: the back-up tapes.

The Restatement recognizes that intangible rights may be converted if they are merged with a document, which is a tangible item. "A document is a chattel and is, therefore, itself the subject of property. As such, it may be the subject of a conversion[.]" Restatement (Second) of Torts §242 cmt. a (1965). And "[w]here there is conversion of a document in which intangible rights are merged, the damages include the value of such rights." *Id.* at §242(1). But "for conversion to lie — even where intangible rights are involved — there must be some tangible thing to which the intangible rights attach which is capable of being wrongfully controlled." *Maryland Staffing Servs., Inc. v. Manpower, Inc.*, 936 F.Supp. 1494, 1507 (E.D. Wis. 1996).

Thus, *Management Computer Services* does not stand for the proposition that Wisconsin law allows for conversion of intangible property. Nor do the other cases that the plaintiffs cited.

*Methodist Manor of Waukesha v. Martin*, 2002 WI App 130, 255 Wis. 2d 707, 647 N.W.2d 409, involved money, which the plaintiffs classified as a type of intangible property. (Plaintiffs' Opposition Brief, p. 23.) *Methodist Manor* involved bank accounts, but in declaring that "money may also be converted," it relied on much older case law involving paper money. 255 Wis. 2d 707, ¶7 (citing *Regas v. Helios*, 176 Wis. 56, 59, 186 N.W. 165 (1922)). Thus, the rule that money may be converted rests on the recognition that money is essentially like any other property:

> "The only difficulty growing out of the nature of money is, as some of the cases have said, a difficulty of fact and not of law. In law, the rights of the parties in respect to the money are the same as in respect to any other property. The only difference is, that the identity of money is more easily destroyed than that of other property."

*Regas*, 176 Wis. at 59 (quoting *Cotton v. Sharpstein*, 14 Wis. 226, 234 (1861)). So, even though we now live in an age of electronic banking, money was historically tangible, and if it is no longer strictly tangible, it may be considered an intangible right that is merged with tangible items. In short, *Methodist Manor* does not show that all forms of intangible property may be converted.

Similarly, *H.A. Friend & Co. v. Professional Stationery, Inc.*, 2006 WI App 141, 294 Wis. 2d 754, 720 N.W.2d 96, also involved money. The plaintiff had purchased assets from the defendant, including "'all cash on hand and in bank accounts at the time of the execution of [the] agreement and all cash equivalents and marketable securities, including savings and money market accounts.'" *Id.* at ¶4 (alteration added). But the defendant "did not turn over the checking account or money market funds," and instead drew down both accounts to zero. *Id.* at ¶5. The court concluded that the allegations about drawing down the checking and money market accounts were sufficient to state a claim for conversion. *Id.* at ¶11. The chief significance of the case for the plaintiffs' argument is that it defines conversion without using the word "chattel," referring instead more broadly to "property." *Id.* But given the facts of that case, the choice of a single word is a slender reed upon which to hang the significance that the plaintiffs claim.

The plaintiffs' other cited cases are from other jurisdictions, and therefore provide no authority for claiming that Wisconsin has recognized conversion of intangible property.

Because the plaintiffs' allegations of conversion do not involve chattels, those allegations fail to state a claim for conversion under Wisconsin law. But they also fail for another reason.

As noted, conversion requires a plaintiff to show that the defendant's exercise of dominion over the plaintiff's property "result[ed] in serious interference with the owner's rights to possess the property." *Midwestern Helicopter*, 351 Wis. 2d 211, ¶9. But the plaintiffs do not assert that they attempted to sell their information and were unable to do so, or that they suffered any loss. (*See* First Amended Class Action Complaint, ¶¶361–67.) At most, the complaint alleges that the defendant profited from the plaintiffs' information, but the plaintiffs have not been deprived of possession of their information, and they no not allege that they have been prevented from doing anything with it themselves. Thus, for this additional reason, the plaintiffs have failed to state a claim for conversion under Wisconsin law.

***2. Breach of implied contract***

A valid contract requires three things: an offer, acceptance of that offer, and consideration. *Piaskoski & Assoc. v. Ricciardi*, 2004 WI App 152, ¶7, 275 Wis. 2d 650, 686 N.W.2d 675. "Offer and acceptance exist when the parties mutually express assent, and consideration exists if the parties manifest an intent to be bound by the contract." *Id.*

A contract may be express or implied. An implied contract, "like an express contract, [requires] the element of mutual meeting of the minds and of intention to contract; it is established by proof of circumstances from which the intention is implied as a matter of fact." *Schaller v. Marine Nat'l Bank*, 131 Wis. 2d 389, 398, 388 N.W.2d 645 (Ct. App. 1986).

Thus, a claim for breach of an implied contract involves the same elements as breach of an express contract. Those elements are: "(1) a contract between the plaintiff and the defendant that creates obligations flowing from the defendant to the plaintiff; (2) failure of the defendant to do what it undertook to do; and (3) damages." *Brew City Redevelopment Group v. Ferchill Group*, 2006 WI App 39, ¶11, 289 Wis. 2d 795, 714 N.W.2d 582, *aff'd*, 2006 WI 128, 297 Wis. 2d 606, 724 N.W.2d 879. In the context of an implied contract, those elements can be established by showing "that (1) the defendant requested [the plaintiff] to perform services, (2) [the plaintiff]

complied with the request, and (3) the services were valuable to the defendant." *Theuerkauf v. Sutton*, 102 Wis. 2d 176, 185, 306 N.W.2d 651 (1981).

Here, the plaintiffs alleged that the Aspirus website's Privacy Policy constituted an enforceable promise to keep website users' information private. (First Amended Class Action Complaint, ¶¶369–78.) They further alleged that Aspirus breached that promise by sharing their information. (*Id.* at ¶¶380, 389–90.) And they alleged that they were damaged as a result of Aspirus's breach, in that they "did not receive the full benefit of their bargains," they overpaid for the services they received, and the sales value of their personal information was diminished. (*Id.* at ¶¶391–94.)

Aspirus argued that the website's Privacy Policy did not create an enforceable contract. It also argued that the plaintiffs conflated their use of the website with the medical services they received from their medical providers, which they subsequently paid for; while the plaintiffs paid for medical services, the website was provided free of charge.

In evaluating the parties' arguments, the Court is mindful that, on this motion, the only issue to be determined is the legal sufficiency of the complaint. The truthfulness and accuracy of the plaintiffs' factual allegations are not under review; rather, for purposes of the motion, those allegations are treated as true. The question is whether those facts, if true, have the legal consequences that the plaintiffs assert.

Regarding the legal consequences of the facts alleged, Aspirus argued that the plaintiffs failed to allege the existence of a contract because they "[did] not allege that Aspirus requested that Plaintiffs submit any information to Aspirus's website" or "that entering any search information provided a 'valuable service' to Aspirus." (Memorandum of Law in Support of Defendant's Motion to Dismiss (hereinafter "Defendant's Brief"), p. 5.) Consequently, Aspirus argued, the plaintiffs have failed to allege consideration. (*Id.* at pp. 5–6.) Finally, Aspirus argued that the plaintiffs failed to allege any damages. (*Id.* at pp. 6–7.)

While it is true that the plaintiffs did not pay anything to use the Aspirus website and that their use of the website was factually distinct from their visits to see medical providers, their use of the website cannot be said to be completely divorced from the medical services they received. The plaintiffs alleged that they used the website to find medical providers, send messages to medical providers, check clinic hours, view test results, pay bills, and schedule appointments. (First Amended Class Action Complaint, ¶¶17–18, 20, 29, 31, 41.) The website, while free of charge, existed to complement and enhance the medical services provided by Aspirus's medical providers, and to some extent, served as an inducement for patients to choose Aspirus. And, according to the plaintiffs, that inducement included the promise contained in the Privacy Policy that users' information would be "kept private." (*Id.* at ¶369.) That is enough to allege the existence of a contract.

The plaintiffs have also alleged breach (*see id.* at ¶¶380, 389–90), so the final question is whether they sufficiently alleged damages. The allegations of overpayment are not sufficient, given that the plaintiffs' allegations are clear that their medical bills were for medical services, not use of the website. But the plaintiffs also alleged that they did not receive the benefit of the bargain with respect to use of the website, and at the pleading stage, that is sufficient. The plaintiffs need not have a dollar amount to attach to that loss at this point.

### *3. Violation of Wis. Stat. §968.31*

Under Wis. Stat. §968.31(1), it is a crime to intentionally intercept "any wire, electronic or oral communication" or to disclose an illegally intercepted communication. Another section of the statute creates a civil cause of action arising out of conduct covered by the statute. Wis. Stat. §968.31(2m). However, the statute contains exceptions, one of which has been cited by the parties.

Here, the plaintiffs alleged that Aspirus's operation of its website violated the statute by intercepting their data and sharing it with Facebook

and Google. (First Amended Class Action Complaint, ¶¶435–44.) They also argued that the interception was illegal under sec. 968.31 because it had criminal, tortious, or injurious purposes. (*Id.* at ¶¶403–19.)

The existence of criminal, tortious, or injurious purposes would be relevant under Wis. Stat. §968.31(2)(c), which is one of the exceptions to the statutory prohibitions. Under sub. (2)(c), an interception is not unlawful "[f]or a person not acting under color of law . . . where the person is a party to the communication or where one of the parties to the communication has given prior consent to the interception unless the communication is intercepted for the purpose of committing any criminal or tortious act in violation of the constitution or laws of the United States or of any state or for the purpose of committing any other injurious act." Thus, under sub. (2)(c), the fact that one party to the communication either consented or was the party doing the intercepting is insufficient to save the conduct if the purpose of the interception was to commit a crime or a tort or cause some other injury.

The plaintiffs argued that Aspirus's acts were criminal, tortious, or otherwise injurious in a variety of ways. Some of the arguments they raised were also alleged as separate claims elsewhere in the complaint,[2] while others were not.[3]

But those arguments seem to elide part of the statutory language. Specifically, the arguments focus on whether Aspirus's conduct actually constituted a violation of one or more of the enumerated crimes or torts, without any attention to Aspirus's purpose. To be illegal, the communication

2 Specifically, the plaintiffs referred to the statutory right to privacy under Wis. Stat. §995.50 (First Amended Class Action Complaint, ¶408), which was alleged as the plaintiffs' fifth cause of action (*id.* at ¶¶454–68). They also cited Wis. Stat. §146.82 (*id.* at ¶410), which was alleged as their seventh cause of action (*id.* at ¶¶478–87). And they referred to conversion (*id*. at ¶419), which was alleged as their first cause of action (*id.* at ¶¶360–67).

3 Arguments raised here but not asserted as separate claims include the federal wire fraud statute, HIPAA, Wis. Stat. §943.201, trespass, and breach of fiduciary duty. (First Amended Class Action Complaint, ¶¶406, 407, 409, 412, 419.)

must have been "intercepted ***for the purpose*** of committing any criminal or tortious act . . . or ***for the purpose*** of committing any other injurious act." Wis. Stat. §968.31(2)(c) (emphasis added). And here, under the factual allegations of the complaint, the purpose for Aspirus's conduct was "marketing and/or analytics." (*See* First Amended Class Action Complaint, ¶438; *see also id.* at ¶¶7, 19, 68, 70–75, 95, 196–97, 285, 472.) Even if the plaintiffs' factual allegations are construed liberally, they do not support the inference that Aspirus's purpose was criminal, tortious, or otherwise injurious.[4] Consequently, under the facts alleged, Aspirus's conduct fell within the exception created by Wis. Stat. §968.31(2)(c) and was not unlawful.

***4. Breach of duty of confidentiality***

In addition to its claims for invasion of privacy and violation of Wisconsin statutes concerning the confidentiality of patient records, the plaintiffs also asserted a separate claim for breach of a duty of confidentiality. That claim relies on *Steinberg v. Jensen*, 194 Wis. 2d 439, 465, 534 N.W.2d 361 (1995), which contains the statement, "Physicians owe an ethical duty of confidentiality to their patients[.]" (First Amended Class Action Complaint, ¶449.)

However, *Steinberg* was concerned with attorney discipline. The court specifically stated, "we point out that our holding places restrictions on lawyers, not on physicians." *Steinberg*, 194 Wis. 2d at 469. Nowhere in its decision did the *Steinberg* court recognize a tort claim for violation of a physician's duty of confidentiality.

In their opposition brief, the plaintiffs cited other cases, but likewise, none stand for the proposition that this is an independent tort claim. For instance, the plaintiffs argued that, in *Korntved v. Advanced Healthcare, S.C.*, 2005 WI App 197, ¶14, 286 Wis. 2d 499, 513, 704 N.W.2d 597, the court had found that a hospital system "may be held liable for 'breach of

---

[4] The Court agrees that this focus on the purpose of the interception distinguishes this case from those cited in the plaintiffs' supplemental brief.

confidentiality.'" (Plaintiffs' Opposition Brief, p. 21.) But the *Korntved* court specifically noted that the claims at issue in that case were statutory; the confidentiality claim arose from Wis. Stat. §146.82. *Korntved*, 286 Wis. 2d 499, ¶1. Similarly, the plaintiffs argued (without a pinpoint citation) that the *Reetz* case held that "hospital systems owe a duty of care to safeguard the personally identifiable information of their employees" (Plaintiffs' Opposition Brief, p. 21), but *Reetz* involved a statutory claim for invasion of privacy. *Reetz*, 405 Wis. 2d 298, ¶18. And *State v. Agacki*, 226 Wis. 2d 349, 358, 595 N.W.2d 31 (Ct. App. 1999), cited for the proposition that mental health professionals owe a duty of confidentiality to their patients (Plaintiffs' Opposition Brief, pp. 20–21), was about evidentiary privileges in a criminal case.

In short, the plaintiffs have not established that Wisconsin law recognizes an independent common law tort of breach of confidentiality, separate from the statutory provisions at issue in other causes of action. At least one other court has come to a similar conclusion. *Linman v. Marten Transport, Ltd.*, 2023 WL 2562712, *7 (W.D. Wis. March 17, 2023). Accordingly, this claim is dismissed.

***5. Invasion of privacy***

The plaintiffs initially alleged two variations on this claim: intrusion upon seclusion and giving publicity to private facts. *See* Wis. Stat. §995.50(2)(am)1., 3. However, they subsequently withdrew the claim of intrusion upon seclusion. Thus, only the claim for giving publicity to private facts remains.

This remaining claim is described in the statute as "[p]ublicity given to a matter concerning the private life of another, of a kind highly offensive to a reasonable person, if the defendant has acted either unreasonably or recklessly as to whether there was a legitimate public interest in the matter involved, or with actual knowledge that none existed." Wis. Stat. §995.50(2)(am)3. To establish this claim, the plaintiffs must establish four elements:

> "(1) a public disclosure of facts regarding the plaintiff; (2) the facts disclosed are private facts; (3) the private matter made public is one which would be highly offensive to a reasonable person of ordinary sensibilities; and (4) the defendant acted either unreasonably or recklessly as to whether there was a legitimate public interest in the matter, or with actual knowledge that none existed."

*Reetz v. Advoate Aurora Health, Inc.*, 2022 WI App 59, ¶18, 405 Wis. 2d 298, 983 N.W.2d 669 (quoting *Pachowitz v. LeDoux*, 2003 WI App 120, ¶8, 265 Wis. 2d 631, 666 N.W.2d 88).

The first element requires publicity, or public disclosure of facts.[5] To show that a private matter has been made public, a plaintiff must show that it was "'communicat[ed] to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.'" *Reetz*, 405 Wis. 2d 298, ¶20 (quoting Restatement (Second) of Torts §652D cmt. a (1977); alteration added). The element requires that the information must have been "disclosed widely enough," which is fact-dependent. *Id.* Disclosure "to one person or to a small group does not, as a matter of law in all cases, fail to satisfy the publicity element of an invasion of privacy claim. Rather, whether such a disclosure satisfies the publicity element . . . depends upon the particular facts of the case and the nature of the plaintiff's relationship to the audience who received the information." *Pachowitz*, 265 Wis. 2d 631, ¶24.

Here, Aspirus argued that the plaintiffs have failed to allege any public disclosure. Given that the plaintiffs have alleged that their information was intercepted and transmitted "immediately and instantaneously" (*see, e.g.,* First Amended Class Action Complaint, ¶251), the complaint seems to

---

[5] The Court will not dwell on the other elements. The allegation that the disclosure included sensitive medical information is sufficient to establish that the facts at issue were private facts and that public disclosure of them would be highly offensive. The facts alleged are also sufficient to satisfy the fourth element, that there be no legitimate public interest in the disclosure, and that Aspirus either knew that or acted unreasonably or recklessly in that regard.

contemplate that the invasion of privacy was entirely automated, and may not have involved any human eyes at all.

But the plaintiffs' argument is that the disclosure was made not to just a couple of people but to a couple of the world's largest companies: Facebook and Google. Given the facts of this case, the Court cannot find, as a matter of law, that "it appears to a certainty that no relief can be granted" under the facts alleged here. *Strid*, 111 Wis. 2d at 422.

***6. Unjust enrichment***

"Unlike claims for breach of an express or implied in fact contract, a claim of unjust enrichment does not arise out of an agreement entered into by the parties." *Watts v. Watts*, 137 Wis. 2d 506, 530, 405 N.W.2d 305 (1987). Rather, a claim for unjust enrichment can arise where no valid contract exists but, under the circumstances, justice requires that compensation be paid. It is sometimes said to be a contract implied in law, which "'is not a contract at all but an obligation imposed by law to do justice even though it is clear that no promise was ever made or intended.'" *Brooks v. Steffes*, 95 Wis. 2d 490, 497 n.4, 290 N.W.2d 697 (1980) (quoted source omitted). Because the doctrine of unjust enrichment depends on a contract implied in law, it "does not apply where the parties have entered into a contract." *Continental Cas. Co. v. Wisconsin Patients Compensation Fund*, 164 Wis. 2d 110, 118, 473 N.W.2d 584 (Ct. App. 1991).

The elements of an unjust enrichment claim are: (1) the plaintiff conferred a benefit on the defendant, (2) the defendant knew of the benefit, and (3) it would be inequitable for the defendant to accept or retain the benefit without paying its value. *Ramsey v. Ellis*, 168 Wis. 2d 779, 784–85, 484 N.W.2d 331 (1992). "It is not enough to establish that a benefit was conferred and retained; the retention must be inequitable." *Puttkammer v. Minth*, 83 Wis. 2d 686, 690, 266 N.W.2d 361 (1978).

Here, the plaintiffs alleged two forms of benefits that they conferred on Aspirus. First, they alleged that they "conferred a benefit on Defendant

by paying Defendant for health care services[.]" (First Amended Class Action Complaint, ¶471.) Although the health care services that the plaintiffs received and for which they paid Aspirus are factually distinct from their use of the Aspirus website, they alleged that they would not have used those services or would have paid less for them if they had known that their information was not private. (*Id.* at ¶473.) Second, the plaintiffs alleged that they conferred a benefit on Aspirus by using the Aspirus website, that Aspirus knew of the benefit and in fact profited from it, and that allowing Aspirus to retain that profit without compensating the plaintiffs would be inequitable. (*Id*. at ¶¶472, 475.)

The truthfulness and accuracy of the plaintiffs' factual allegations are not subject to review on this motion. As noted above, this motion is about the legal sufficiency of the complaint, and consequently, well-pleaded facts are treated as true. *Data Key*, 356 Wis. 2d 665, ¶¶18–19, 21; *Cattau*, 386 Wis. 2d 515, ¶¶4–6.

With respect to the first form of benefits allegedly conferred on Aspirus — "paying Defendant for health care services" — the complaint fails to state a claim for unjust enrichment. Unjust enrichment is unavailable where the parties' relationship is governed by a contract, and that is true with respect to the provision of health care services. The facts alleged do not support any scenario where health care services were provided in the absence of a contract to do so.

However, the second form of benefits allegedly conferred on Aspirus — using the website — is a different matter. The plaintiffs alleged the existence of an implied in fact contract, but they are entitled to pursue this claim in the alternative. *See Mohns Inc. v. BMO Harris Bank Nat'l Ass'n*, 2021 WI 8, ¶52, 395 Wis. 2d 421, 954 N.W.2d 339 ("A party may plead claims for relief in the alternative"). And their factual allegations touch upon each of the elements of unjust enrichment: by using the website, they conferred upon Aspirus the benefit of their data, Aspirus was aware of the benefit and

in fact profited from it, and allowing Aspirus to retain that benefit would be inequitable. Thus, the unjust enrichment claim is not subject to dismissal.

***7. Violation of confidentiality of patient health care records***

The confidentiality of patient health care records is governed by Wis. Stat. §146.82. The opening sentence of the statute sets the goal: "All patient health care records shall remain confidential." Wis. Stat. §146.82(1). And if that goal is not met, civil liability may follow. Wis. Stat. §146.84(1).

For purposes of these statutes, the term "patient health care records" is defined in relevant part[6] as "all records related to the health of a patient prepared by or under the supervision of a health care provider." Wis. Stat. §146.81(4). The term "includes billing statements and invoices for treatment or services provided by a health care provider." *Id.*

The term "health care provider" is defined by reference to a lengthy list of medical professionals, including nurses, chiropractors, dentists, physicians, physical therapists, podiatrists, dieticians, optometrists, pharmacists, and others. Wis. Stat. §146.81(1)(a)–(hp). As relevant here, the definition also includes "[a] corporation or limited liability company of any providers specified under pars. (a) to (hp) that provides health care services." Wis. Stat. §146.81(1)(j).

So, applying these definitions, Wis. Stat. §146.82 protects the confidentiality of records related to the health of a patient prepared by or under the supervision of a medical professional or a corporation of medical professionals that provides health care services.[7]

---

[6] The definition also includes records made by ambulance or emergency medical personnel, but those parts of the definition are not implicated in this case.

[7] The plaintiffs also referred to Wis. Stat. §146.816. (First Amended Class Action Complaint, ¶¶481, 483.) That statute was enacted to make state law more closely follow the requirements of federal law under HIPAA. *Wall v. Pahl*, 2016 WI App 71, ¶14, 371 Wis. 2d 716, 886 N.W.2d 373. Under §146.816, when a "covered entity" uses, discloses, or requests disclosure of "protected health information" in a patient health record, it "is exempt from the confidentiality requirements of Wis. Stat. §146.82 . . . if the use, disclosure, or request for disclosure complies with federal

Aspirus argued that the plaintiffs' interactions with its website cannot qualify as patient health care records because they were created by the plaintiffs themselves and because the information was not reduced to a record. In support of its argument, Aspirus cited *Wall v. Pahl*, 371 Wis. 2d 716, ¶28, which set forth three requirements for patient health care records. The first requirement was that "a patient health care record must be a 'record.' The statutory definition does not encompass mere information that is not reduced to a record." *Id.* The second requirement was that "the record must have been prepared by or under the supervision of a health care provider." *Id.* And third, "the record must relate to the patient's health." *Id.*

The Court doubts that information entered by the plaintiffs into the Aspirus website, including a record of searches performed, would qualify as a "patient health care record." It was not maintained as a record, and it was not prepared by or under the supervision of a health care provider. If that were the extent of the plaintiffs' factual allegations, this claim would fail.

But the plaintiffs also alleged that the disclosures here included information from within the patient portal, which allowed them to access their health care records. (*See, e.g.,* First Amended Class Action Complaint, ¶¶17–20, 29–31, 41, 48–49, 69, 75, 89–91, 98.) At the pleading stage, those allegations are sufficient to set forth a legally sufficient claim for violation of Wis. Stat. §146.82.

**CONCLUSION**

On a motion to dismiss for failure to state a claim, the facts pleaded are treated as true, and the Court's task is to determine whether those facts have the legal consequences that the plaintiffs have asserted. For the reasons set forth above, the Court has determined that that standard is not met

---

regulations and is made for purposes of treatment, payment, or health care operations." *Id.* Under the facts alleged here, Wis. Stat. §146.816 appears to be inapplicable.

with respect to the claims for conversion, violation of Wis. Stat. §968.31, and breach of the duty of confidentiality.

**THEREFORE, IT IS HEREBY ORDERED** that, with respect to the plainitffs' first, third, and fourth causes of action, the defendant's motion to dismiss is granted. Those causes of action (conversion, violation of Wis. Stat. §968.31, and breach of the duty of confidentiality) are dismissed on the merits.

**FURTHERMORE, IT IS HEREBY ORDERED** that, with respect to the plaintiffs' remaining claims, the defendant's motion to dismiss is denied.

Because this order does not dispose of the entire matter in litigation as to one or more parties, it is not final for purposes of appeal.[8]

cc: Atty. Alex Phillips
Atty. Matthew Splitek

[8] "A final judgment or final order is a judgment, order or disposition that disposes of the entire matter in litigation as to one or more parties[.]" Wis. Stat. §808.03(1). "[I]n order to 'dispose' of the matter under §808.03(1), a memorandum decision must contain an explicit statement either dismissing the entire matter in litigation or adjudging the entire matter as to one or more parties." *Wambolt v. West Bend Mut. Ins. Co.*, 2007 WI 35, ¶39, 299 Wis. 2d 723, 728 N.W.2d 670.

# Exhibit B

FILED DATE: 10/1/2021 4:23 PM 2021CH03759



UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| IN RE DOMINION DENTAL SERVICES USA, INC. DATA BREACH LITIGATION | . | Civil Action No. 1:19cv1050 |
| | . | Alexandria, Virginia |
| | . | January 17, 2020 |
| | . | 10:01 a.m. |

. . . . . . . . . . .

# TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFFS:

BERNARD J. DiMURO, ESQ.
DiMuro Ginsberg, P.C.
1101 King Street, Suite 610
Alexandria, VA 22314
and
KIM D. STEPHENS, ESQ.
Tousley Brain Stephens PLLC
1700 Seventh Street, Suite 2200
Seattle, WA 98101
and
BARRETT J. VAHLE, ESQ.
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112

FOR DOMINION NATIONAL AND CAPITAL BLUECROSS DEFENDANTS:

KATHERINE L. McKNIGHT, ESQ.
Baker & Hostetler, LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5304
and
DAVID A. CARNEY, ESQ.
Baker & Hostetler, LLP
Key Tower, 127 Public Square
Suite 2000
Cleveland, OH 44114-1214

(APPEARANCES CONT'D. ON PAGE 2)

(Pages 1 - 30)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

FILED DATE: 10/1/2021 4:23 PM 2021CH03759



APPEARANCES: (Cont'd.)

FOR DOMINION NATIONAL AND CAPITAL BLUECROSS DEFENDANTS:

PAUL G. KARLSGODT, ESQ.
Baker & Hostetler, LLP
1801 California Street
Suite 4400
Denver, CO 80202-2662

FOR DEFENDANT PROVIDENCE HEALTH PLAN:

DANIEL P. REING, ESQ.
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue, N.W.
Suite 800
Washington, D.C. 20006
and
BRADLEY L. FISHER, ESQ.
Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610

OFFICIAL COURT REPORTER:

ANNELIESE J. THOMSON, RDR, CRR
U.S. District Court, Third Floor
401 Courthouse Square
Alexandria, VA 22314
(703)299-8595

FILED DATE: 10/1/2021 4:23 PM 2021CH03759



P R O C E E D I N G S

THE CLERK: Civil Action 19-1050, Sayed Abubaker, et al. versus Dominion Dental USA, Inc., et al. Would counsel please note their appearances for the record.

MR. CARNEY: Dave Carney for the Dominion National and Capital BlueCross defendants.

THE COURT: All right, Mr. Carney.

MR. DiMURO: Good morning, Your Honor. Ben DiMuro on behalf of the plaintiffs. With me are Kim Stephens and Barrett Vahle, who have been admitted pro hac vice, and they will, with Your Honor's permission, split different parts of the argument.

THE COURT: All right, that's fine. So we have Mr. Carney for Dominion, and who else do we have for the defendants?

MS. McKNIGHT: Good morning, Your Honor. Kate McKnight for Baker Hostetler on behalf of the Dominion defendants. Along with me today are my colleagues, Paul Karlsgodt and Dave Carney. They also, they are admitted to this court pro hac vice, and with the Court's permission, they would like to split argument on our side of the motion today.

THE COURT: All right. Well, we'll see how much splitting goes on.

(Laughter.)

MS. McKNIGHT: Thank you, Your Honor.

THE COURT: How about for Providence?

FILED DATE: 10/1/2021 4:23 PM 2021CH03759



MR. REING: Good morning, Your Honor. Dan Reing of Davis Wright Tremaine on behalf of Providence Health Plan, and I'm joined by my colleague, Brad Fisher, who's admitted pro hac vice, and he will be arguing on behalf of Providence.

THE COURT: All right, that's fine. Since I don't know a lot of you, counsel, again, as you speak, just reintroduce yourselves. Thank you.

All right. Well, we're going to -- this may -- this is a long and big case, and it may be a very short hearing because I think the core issue in this case, as it always is for federal court, is whether we have jurisdiction, and the defendants have all raised this issue of whether or not any of these named plaintiffs have standing given the nature of the law in the Fourth Circuit, and they've pointed specifically to the *Beck* decision, which I'm required to follow even if the Ninth and other circuits might be going in a different direction, but as you know, under that -- under the Fourth Circuit decision in *Beck*, in order for there to be Article III standing, a plaintiff has to establish that there's actually been an injury.

And in this case, with one exception or possibly two exceptions, which we'll talk about, and that's what I really want to sort of focus on to some degree, I don't see how the other named plaintiffs have come anywhere close to satisfying the *Beck* -- getting over the *Beck* hurdle.

FILED DATE: 10/1/2021 4:23 PM 2021CH03759

And, you know, *Beck* stands for the proposition that you can't get Article III injury standing based solely on a concern about an increased risk of harm. That's not cognizable in the Fourth Circuit, and they've addressed that in the specific context of an identity theft case. Nor can you -- is it sufficient to show that the plaintiffs have had to engage in certain costs to protect themselves against the harms from identity theft. That's just not enough.

Now, there are six -- and I want to just grab the complaint, which I have somewhere in my stack of papers here. Okay.

There are at the present time, and I'm starting in paragraphs 77, because I think that -- where you have the plaintiffs' individualized or individual allegations, and you first of all have Mr. Abubaker, and his allegation and the only allegation here is that after he was notified of the data breach, as a result, he purchased Private Guard at $10 per month. He has also expended time and effort monitoring his financial accounts, one of which has experienced illegal activity over the past year that may have been connected to the data breach.

So first of all, what exactly is the illegal activity? Which one of you represents Mr. Abubaker?

MR. VAHLE: Barrett Vahle, Your Honor.

THE COURT: Yes, sir.

FILED DATE: 10/1/2021 4:23 PM 2021CH03759



MR. VAHLE: On behalf of the plaintiffs.

THE COURT: Okay.

MR. VAHLE: So his illegal activity, as I understand it, was a, was a charge on a card.

THE COURT: There was --

MR. VAHLE: I do know that documents have been produced related to it, but as it's pled, it's that there was illegal activity on an account.

THE COURT: All right. So there was a charge, one charge?

MR. VAHLE: Yes. That's, that's my understanding, Your Honor, but I don't want to misstate the record. So I could look and figure that out for sure.

THE COURT: Well, you know, the defendants put all plaintiffs' counsel on notice that this issue about standing was going to be the core issue. That's certainly how we have evaluated the case as we went through this case in chambers, because, you know, jurisdiction is always the first and most important issue in any kind of a motion to dismiss, and so I would think you would have come to court with every possible detail you might have at this point as to the alleged injury that a particular plaintiff may have encountered.

MR. VAHLE: I understand that, Your Honor.

THE COURT: All right.

MR. VAHLE: I apologize for not recalling more

FILED DATE: 10/1/2021 4:23 PM 2021CH03759



quickly, but the point, if I can make it, under *Beck* is *Beck* is very clear on the standard for showing an imminent risk of injury in this context, which is either indicia of intent by criminals to steal the information, okay, and we have that here, or, two, on an instance of at least one plaintiff of some act of fraud that could be carried out with the same information.

So, for example, with Ms. Hilliard, who I can recall specifically what her information is, with Ms. Hilliard, she had an account opened in her name in Texas, a fraudulent account, that had a $60 limit. It was with My- -- she discovered it through MyIDCare. It was a credit card account.

So in that instance, that was information that clearly could have been taken in the Dominion data breach which involved Social Security numbers, names, etc. Under *Beck*, that standing alone is enough because it's one plaintiff, Your Honor.

THE COURT: Yeah, it's one plaintiff in one case, but, I mean, that's -- and I agree with you that Hilliard might be enough, but then you have some other specific problems with Hilliard. For example, the defendants have argued that there is a forum selection clause in the contractual documents that she has that requires that she litigate any claim she has against the insurer with -- in Pennsylvania.

Now, I know you've responded, well, they didn't

FILED DATE: 10/1/2021 4:23 PM 2021CH03759



actually cite to, what, 12(b)(3), but their wording is clear. That is an argument that the defendants have made, and I don't think that you're able to respond to that terribly successfully. So she may have a claim, but it may not be in this court.

MR. VAHLE: I think, Your Honor, on the pleadings, we have alleged that this was her injury and --

THE COURT: Well --

MR. VAHLE: -- that she has standing in this court because of that injury.

And, Your Honor --

THE COURT: Well, not if she's got a forum selection clause that, that says that any claim that she's going to bring against these defendants. Now, she could probably maybe sue the hacker or the person who accessed her account possibly here, maybe not, though, but how does she maintain her action against these defendants when she's got a clause in the contractual documents that are a significant part of your claims in this case that says she has to sue in Pennsylvania?

MR. VAHLE: Our argument, Your Honor, is that cannot be decided at the pleading stage, okay? They've, they've identified a contract, but we need to move past this stage to test that, to understand exactly what the terms are and how they apply.

But I would also say she is an example, okay, of a

FILED DATE: 10/1/2021 4:23 PM 2021CH03759



plaintiff or of a person who has this type of fraud, okay? And in my view, certainly under *Beck*, if you have plaintiffs, whether they're here or not, whether they're -- if there are instances of fraud that can be shown that are plausibly related to the breach, which these are under the law, then there is standing for all of the plaintiffs to bring their claims, for example, for mitigation damages.

THE COURT: All right. Now, this case, of course, was filed awfully quickly. I mean, I think the notice of the, of the breach occurred -- the notices went out sometime in, what, June of 2019, May or June?

MR. VAHLE: June, Your Honor.

THE COURT: And the first lawsuit was filed October? November?

MR. VAHLE: Something like that.

THE COURT: Very few months, all right.

And in that time frame, do you understand or do you know what exactly the nature of the breach was?

MR. VAHLE: So we --

THE COURT: I mean, for example, let me give you an example. They just announced in the paper a few days ago NSA discovered some problem with Microsoft, right?

MR. VAHLE: Right.

THE COURT: I don't know what the problem is. All I know is all of a sudden, everybody who's got that particular

Case: 1:24-cv-01404 Document #: 21 Filed: 04/23/24 Page 70 of 90 PageID #:578

FILED DATE: 10/1/2021 4:23 PM 2021CH03759



system has gone around and thrown out patches and done things to correct it.

The fact that there may be a vulnerability or an opening into a computer system, does that necessarily mean that information has been stolen?

It's like you come home to your house -- I locked my front door when I left my house this morning, and I come home and the door's open. Do I necessarily know that something was stolen?

Now, if the door was broken, I'd have a really clear idea that somebody went into my house with an intent to do something wrong, but I can't tell from this complaint even what the nature of this data breach was. Do you have any more information about that?

MR. VAHLE: The door was broken, Your Honor.

THE COURT: Okay.

MR. VAHLE: And Dominion admitted as much in the press release and notice that they put out after the breach. Okay? There was malware installed on the computer, and, of course, this is all the subject of discovery, which we're in the midst of, but there is no question that a hacker, okay, a criminal third party intruded into their network for something like a period of nine years. They just discovered it recently.

There is no question that the reason such hackers do that is to gather information to use in identity fraud. That's

FILED DATE: 10/1/2021 4:23 PM 2021CH03759



all alleged in the complaint.

THE COURT: Okay.

MR. VAHLE: So in my response to your, your question about the door being unlocked, this is definitely kicked open.

THE COURT: All right.

MR. VAHLE: And we do know that.

THE COURT: All right, let me hear from defense. Who wants to respond to this?

First of all, on the issue of Ms. Hilliard, I would expect that you are not going to contest that she's not sufficiently alleged the kind of injury that would survive *Beck*.

MR. KARLSGODT: Your Honor, first of all, Paul Karlsgodt for the defendant.

THE COURT: Yes.

MR. KARLSGODT: We would argue that her allegations are insufficient to satisfy the fairly traceable requirement for our Article III, and that is that the fact that someone out of 3 million people who were notified about this incident had some sort of an identity theft issue is hardly surprising, and that's -- I'm sort of paraphrasing from the *SAIC* decision that's been cited in both parties' briefs, that the fact that they can go out immediately after an incident like this and find someone who happens to have identity theft is not a big surprise.

FILED DATE: 10/1/2021 4:23 PM 2021CH03759



What is missing from the allegations in this case for both Ms. Hilliard and for Mr. Abubaker is anywhere effort to trace the instances of claimed fraud or misuse to this particular incident.

THE COURT: But isn't that what discovery is all about? In other words, at this stage of the proceedings, what the Court has to do is review the allegations in the complaint. Under *Iqbal*-*Twombly* now, we're looking at do the allegations create a plausible basis to believe or sufficient facts that one could say plausibly that yes, the claim has been made.

Now, again, you have to draw all inferences in favor of the plaintiff at this, at this time. So I agree with you there are holes, but I think you've been put on fair notice as to what the theory of the plaintiffs' case is, and in terms of discovery, it may or may not be relatively easy to see exactly what happened in her case.

Because one of the things I've been toying with is the case as it's currently structured right now is, is way too complicated. The costs of litigating and discovery in this case are going to be ridiculous, and I am very concerned about that, it's my job as a trial judge to try to get cases focused, and one of the thoughts that I've had in chambers is possibly to let the Hilliard case alone go forward, focus all the discovery on her case, because that would enable you-all to discover, for example, the true nature of the breach, what the

FILED DATE: 10/1/2021 4:23 PM 2021CH03759



defendants were doing in terms of protecting against such conduct, because if, in fact, you were taking reasonable, professionally acceptable security measures, I mean, it's been alleged that you were not, but if, in fact, you were taking appropriate steps to protect your data -- because there's no way anybody in this day and age can guarantee that the data is going to be safe.

We've seen OPM, we've seen, you know, fairly sensitive government institutions be hacked. So the reality is and I don't think any court is going to hold anybody to strict liability. That's not the standard.

So whatever the normal, professional way of approaching data protection is, you know, if you've not been complying with it, then, you know, you've got a liability problem. Then the only other issue is can the plaintiff connect her injury in Ms. Hilliard's case to that.

One of the problems I think the plaintiffs may have is, for example, if this were ever to become a class action, because I don't think we're anywhere near that point yet, anybody who's a federal employee who would -- how would you show if you're a federal employee and you also had this dental insurance, whose breach caused your damage, if, in fact, you did have, you know, your identity stolen? Did it come from the OPM breach, or did it come from this breach?

I suspect now that a significant number of the

Case: 1:24-cv-01404 Document #: 21 Filed: 04/23/24 Page 74 of 90 PageID #:582

FILED DATE: 10/1/2021 4:23 PM 2021CH03759



American population has had at least one breach of their data because there have been so many.

So, I mean, that's an interesting problem down the road. Discovery would enable both sides to have a better handle on what that looks like, but that's one of the concerns that I have in this case.

Right now, of the six named plaintiffs, the only two that even pass muster with -- under *Beck* are Abubaker and Hilliard, and those were, I think, in the same original complaint, if I'm not mistaken. The other four plaintiffs don't have it. They don't have standing.

And so I know we've consolidated these cases, but at this point, two of the three consolidated cases would not at this point have standing to go forward. So that's, that's an issue that I'm, I'm also concerned about.

Have you-all tried to talk about how you would approach discovery in this case? Has there been any effort made to try to narrow or tailor things so that this could go forward at a somewhat reasonable pace?

MR. KARLSGODT: Your Honor, if I could address that question as well as the more practical solution?

THE COURT: Yeah.

MR. KARLSGODT: Because I agree wholeheartedly with the idea of trying to limit the issues in this case in order to make it less expensive. So far, that has not been how the case

FILED DATE: 10/1/2021 4:23 PM 2021CH03759


has progressed. The case has progressed full bore, all discovery on all issues to be completed within the Court's deadlines, and I understand that that is the way this Court operates, and we're not taking issue with that.

It is extraordinarily expensive, particularly in a case like this, where to get the discovery relating to what happened requires forensic analysis, it requires highly technical experts. It is extremely expensive even if there's only one plaintiff, and -- because any one plaintiff is going to have the same arguments as any other plaintiff, that the defendant was negligent.

Now, my suggestion for how to make it less complicated and less expensive would be to have an initial process focused on the named plaintiff's claim of injury, because then the Court can after discovery make a determination about Article III jurisdiction.

And in this case, that could focus on the either Ms. Hilliard or both Mr. Abubaker and Ms. Hilliard, on finding out more about what it is they're claiming happened to them and how it could have been conceivably related to Dominion, as opposed to any of the other various data breach incidents that have occurred over the last few years.

That is really the only way that I can think of to limit discovery in a way that makes the issues clear and makes the process less expensive, because if we don't do it that way,

Case: 1:24-cv-01404 Document #: 21 Filed: 04/23/24 Page 76 of 90 PageID #:584
FILED DATE: 10/1/2021 4:23 PM 2021CH03759


the plaintiffs -- and, of course, it's their right to do this if they're allowed -- will want to focus on the negligence of the defendant. That's the key issue that they want to get to, and that's the issue that's very expensive to litigate.

THE COURT: So, I mean, Capital One has had a major breach, right?

MR. KARLSGODT: Yes.

THE COURT: OPM has had a major breach. We're talking, like, hundreds of thousands or millions of individuals affected by these breaches. And -- so that's a very serious issue.

I mean, going back to plaintiffs' counsel for a second, what kind of vetting have you done of your client to see if your client, for example, has received within the last year any other notices that her data might have been breached? Have you asked her that question?

MR. VAHLE: Yes, we have.

THE COURT: All right.

MR. VAHLE: We've asked that of all the clients as part of discovery --

THE COURT: All right.

MR. VAHLE: -- which we have produced and continue to provide to the defendants.

THE COURT: And have any of the -- have either Mr. Abubaker or Ms. Hilliard, either of them had any other

Case: 1:24-cv-01404 Document #: 21 Filed: 04/23/24 Page 77 of 90 PageID #:585
FILED DATE: 10/1/2021 4:23 PM 2021CH03759


notices of breach?

MR. VAHLE: I cannot answer that question right now. It's not a -- it's not a pleadings issue. It's certainly a discovery issue.

THE COURT: Right.

MR. VAHLE: It's not a -- it's not a standing issue, but I take -- Your Honor, I take your point.

THE COURT: Yeah.

MR. VAHLE: I'm a class member in OPM from when I was a law clerk. There are a lot of breaches; this is true. There is no question that at the end of the day, causation of out-of-pocket costs caused by the breach, like fraud, that's a difficult issue.

Now, diminution in value of personal information, a different issue.

THE COURT: Yeah, I don't see how you can make that argument as an individual. I've never heard of a -- I don't know of any cases that have recognized the concept that an individual, not a company, somehow could sell their data for value. Where is that coming from?

MR. VAHLE: We've cited several cases. Judge Koh in the *Anthem* case held as much. There are several other cases in the Ninth Circuit.

THE COURT: Yeah, but it's --

MR. VAHLE: I liken it -- Your Honor?

FILED DATE: 10/1/2021 4:23 PM 2021CH03759



THE COURT: Yeah.

MR. VAHLE: If I may, I liken it to an IP case, okay? It's an intangible harm, but it is a harm. There is a -- there is a market for this information. It's valuable both to these, to these hackers, these black marketeers. It has a particular value that can be quantified by an expert. Our experts can do that.

It has a particular value to the defendants. They value this on their books, or at least many defendants in the similar situation value this on books.

THE COURT: But how is that a value to the plaintiff? How can you say that the value -- something that's worth something to somebody else is somehow something that I can take as a value for me? I mean, the Ninth Circuit may have gone in that direction, but I don't know any case law in the Fourth Circuit that's bought that argument.

MR. VAHLE: I do not know any case law in the Fourth Circuit that, that has bought it specifically.

THE COURT: Yeah.

MR. VAHLE: Judge Chuang in the *Khan* case did not buy that argument, although I would say in *Khan* and there's another case called *Chambliss*, those cases were specifically instances where there was no standing because there was no indicia, and that's the issue with standing.

Most of the cases that have denied standing are cases

Case: 1:24-cv-01404 Document #: 21 Filed: 04/23/24 Page 79 of 90 PageID #:587

FILED DATE: 10/1/2021 4:23 PM 2021CH03759



where there's a misplaced or stolen laptop. There's not an indication that hackers intentionally targeted the information, okay? And that's the situation here. And that's the situation that *Beck* says -- and particularly if one of the plaintiffs, any plaintiff has suffered an instance of fraud of any kind that could be plausibly traced to the breach, that that's the end of story. All plaintiffs have standing as relates -- because they have that increased risk of injury.

But back to the point on, on the value of the information, in our view, we have pleaded it. We've pleaded it. It has value to us, that it is diminished, and that the, the recovery -- potential recovery of that is an issue for, for summary judgment, for discovery.

We also have benefit of the bargain damages. We have contract claims. We have unjust enrichment claims that the defendants have not even moved to dismiss.

THE COURT: Well, they haven't done that because their primary argument is that there's no Article III standing for the plaintiffs, but, I mean, with Hilliard, there is, I think, at this point arguably Article III standing. She's alleged two instances.

What is the tax issue? I'm not clear actually about that.

MR. VAHLE: So there was a -- this last tax year, she provided an affidavit. We have produced the documents. It's a

FILED DATE: 10/1/2021 4:23 PM 2021CH03759



little unclear to me exactly what the issue was, but we have the -- and we have produced it. We have the confirmation back from the IRS. There's some type of tax fraud involved. Frankly, Ms. Hilliard's -- English is not her first language. I have not talked to her personally, although my colleagues have, but it's an issue of tax fraud that commonly comes out of breaches like this.

THE COURT: The normal tax fraud that comes out is that somebody files for a rebate --

MR. VAHLE: Correct.

THE COURT: -- to which the taxpayer was actually not entitled, but the person has the Social Security number and the address information and files, and there were a fair number of those in the past that certainly were reported in the papers.

MR. VAHLE: That's right.

THE COURT: I was assuming that, but it's not explicitly alleged in the complaint.

MR. VAHLE: That's right.

THE COURT: So we don't really know the nature of that.

MR. VAHLE: And back to that point and to your first point, Your Honor, you caught me flat-footed at the beginning, and I apologize for that. I was looking at the pleading. I think the pleading is sufficient.

But as to Mr. Abubaker and Ms. Hilliard, we're

FILED DATE: 10/1/2021 4:23 PM 2021CH03759



certainly happy to provide more artful language or more detail if that would help the Court in, in deciding the standing issue. I think you can decide it right now, and I don't think it -- I don't think it needs to slow the case down. I think we can continue apace, but that's certainly something that could be done. But again, I would urge that just *Beck* on its face says that the plaintiffs have standing.

Now, as to the point of potentially doing a bellwether, I think we have no problem -- we would like to move the whole case forward. We have no problem in concept with picking particular claims to move forward, say we move forward with a negligence case under Virginia law or whatever it might be. We've done that in other cases.

We certainly do have an objection to focusing only on, say, specific causation as to, as Mr. Karlsgodt said, as to out-of-pocket damages caused by fraud as to Ms. Hilliard, instead of focusing on duty and breach, for example, in a negligence case or unjust enrichment to the defendants.

I think that those inquiries are important to the case, and it should be allowed, the claims and defenses, or a particular claim and those defenses should be allowed to proceed together through discovery. And we're already there, frankly. The parties have done a lot of work.

It is expensive; I agree with Your Honor; but I do think we're doing it fairly efficiently. We've been in front

Case: 1:24-cv-01404 Document #: 21 Filed: 04/23/24 Page 82 of 90 PageID #:590

FILED DATE: 10/1/2021 4:23 PM 2021CH03759



of Judge Nachmanoff twice. We're working, I believe, very collegial and well with defense counsel in moving the case forward. And that's what we would ask that you let us do on the pleading as it stands.

THE COURT: Well, the, the Hilliard and Abubaker claims are in one original complaint. They came in the -- which one was it? They were all in the same complaint, as I recall, correct?

MR. VAHLE: I believe that's right. It was called Abubaker.

THE COURT: And that was the one that was filed -- yeah, they are. That was in case 1050, which was that the first one that was filed here?

MR. VAHLE: It was the first case filed before this division, Your Honor.

THE COURT: Yeah, all right. And that has Pennsylvania law for Ms. Hilliard, right? And it has Virginia law because Dominion is here in Virginia. And Abubaker is located where? Where is he located?

MR. CARNEY: District of Columbia.

THE COURT: District of Columbia? So that's all sort of local stuff. That would significantly simplify the issues in that case.

I mean, my instinct on this one is to let basically 1050 go forward with the claims of those two as being the two

FILED DATE: 10/1/2021 4:23 PM 2021CH03759



that we focus on. I think that the defendant is correct that the -- and the other two cases being dismissed without prejudice at this point.

There's an issue with Providence that we haven't talked about, either, in one of the other cases that I think has a lot of merit to it, but focusing on this issue about, number one, whether the two named plaintiffs who have arguably sufficiently alleged Article III standing; focusing intensely on the discovery there as to the absolute nature of what the, what the breach has been, the timing of it, the nature of the breach, the kind of information that was used in the breach, that sort of thing; and then also requiring from the defense side a clear picture as to what, if any, security measures were made during these various time period at issue to address, you know, keeping the system appropriately secure; and knowing what the nature of the hack was.

I mean, if it was an extremely -- I don't know anything about it really, whether it was an extremely sophisticated breach such that the normal methods that are normally used in the industry were not able to adequately protect against it, etc.; whether there was, what, about a two-month delay between the time the defendant became aware of the breach and notice, that's not a very long time period. I don't know if that's really an issue, any argument be made about improper delay, but you'd have to show that there was

FILED DATE: 10/1/2021 4:23 PM 2021CH03759



some damage that occurred in that two-month time period.

But I would think with that type of a narrowing, the case would not be as convoluted as it is right now, where you're dealing with, you know, multiple different state laws, you won't have as much state law involved.

And the core issue is going to be from the, it seems to me, from the defendants' standpoint, if the plaintiff can show that you were not complying with industry standards in terms of how you were protecting the data, then the handwriting is on the wall, and the only issue then is to figure out how you -- you know, what the appropriate remedies would be for that.

If on the other hand you were doing what everybody else was doing in the industry and that's part of the industry practice and so, you know, the fact that these crooks were smarter than you-all, that's not going to be enough to create liability in my view, and that would end it. Or if the plaintiff can't show, you know, the necessary connection between the breach, that is, if there were other breaches to which she or he were exposed so that there are two equally acceptable bases upon which the damage may have occurred, I'm not sure the plaintiff can survive on that.

So I don't think a case can be overly complicated if it's narrowed that way, but right now, with the various issues that are created by having so many different plaintiffs with so

FILED DATE: 10/1/2021 4:23 PM 2021CH03759



many different sources of law, it becomes an unmanageable case. All right?

MR. VAHLE: So if I may, Your Honor, is what you're asking or what you're saying, proceed with that original case, with the claims delineated therein specifically, as opposed to this broader --

THE COURT: The amended complaint or the consolidated complaint that you've produced, in my view, at this point is unwieldy, and it improperly -- it's unwieldy, period, and so the original complaints that were filed, the way they were done, 1050 did, in fact, allege or at least as the -- I don't know if the allegations -- because I didn't compare the consolidated complaint to the original complaints. I'm assuming the allegations as to the individual damage was taken right from those complaints.

MR. VAHLE: I can say they're similar. I can't say whether they're verbatim but --

THE COURT: But Hilliard and Abubaker were named in the 1050.

MR. VAHLE: Correct.

THE COURT: All right. And so I think 1050, if looked at by itself, did adequately allege under *Beck* the kind of Article III standing that's at issue in this case, so it would survive that, all right?

And then I think at this point, again, drawing all

FILED DATE: 10/1/2021 4:23 PM 2021CH03759



inferences in favor of the plaintiffs, we have to let that case go forward, not as a class action at this point, but as a two-plaintiff case against the named defendants in that case.

MR. KARLSGODT: Your Honor, may I make a point of clarification?

THE COURT: Yeah.

MR. KARLSGODT: There are three plaintiffs -- there are three plaintiffs in that. I believe the third is Cardiff.

THE COURT: But I don't think --

MR. KARLSGODT: It may be that Cardiff didn't make it to the --

THE COURT: I don't think Cardiff made it to the amended complaint -- the consolidated complaint.

MR. VAHLE: He did, Your Honor.

THE COURT: He did make it?

MR. VAHLE: Yes, Your Honor.

THE COURT: But the only two, as I read those paragraphs that allege the kind of specific damage, just getting -- just spending time worrying about whether their data had been misused, buying insurance to protect against some inchoate injury in the future is not sufficient.

MR. VAHLE: Mr. Cardiff specifically purchased identity monitoring for $200.

THE COURT: Right.

MR. VAHLE: This is sufficient under *Beck* for

Case: 1:24-cv-01404 Document #: 21 Filed: 04/23/24 Page 87 of 90 PageID #:595
FILED DATE: 10/1/2021 4:23 PM 2021CH03759


standing as to Mr. Cardiff because of the, of the identity fraud fairly traceable to the breach suffered by Abubaker and Hilliard.

THE COURT: I don't agree. I think the costs of measures to protect against potential identity theft is not sufficient. So I'm -- no. I'm going to go with just the two plaintiffs, all right?

MR. VAHLE: Okay. I think *Hutton*, Your Honor, certainly rules and acknowledges that that litigation cost is when combined with -- but, but I will not further argue it, Your Honor.

THE COURT: All right. Okay.

MR. VAHLE: And --

THE COURT: So what we're going to do then, we're going to -- I'm going to direct you to refile 1050. The other two are in abeyance. Let's see how 1050 develops. It's a narrower area of law that has to be applied. We can get this case on track and see what's going on, because again, right now it's way too broad, all right?

MR. VAHLE: And may we file it as a class action but proceed with the individual claims?

THE COURT: I'm not certifying a class at this point. I want to see what you've got.

MR. VAHLE: But may we include in the pleadings the class allegations for the, for the record?

Case: 1:24-cv-01404 Document #: 21 Filed: 04/23/24 Page 88 of 90 PageID #:596

FILED DATE: 10/1/2021 4:23 PM 2021CH03759



THE COURT: For the record, you may do so, yes.

MR. VAHLE: Thank you, Your Honor.

THE COURT: All right? Okay? I think that at this point takes care of Providence's concerns because you're not a named defendant, as I recall, in this case.

MR. FISHER: Yes.

THE COURT: Yes.

MR. FISHER: May I be heard just briefly on that, Your Honor?

THE COURT: Yes.

MR. FISHER: So clarity for me, and you clearly thought about this at about four levels deeper than I even have, so I'm trying to wrap my head around it, Mark Bradley is the only named plaintiff who is suing my client, Providence Health Plan, which is a nonprofit exchange health plan in Oregon.

THE COURT: Right.

MR. FISHER: Based on my understanding of the Court's rulings today, he lacks Article III standing.

THE COURT: At this point, that's correct.

MR. FISHER: And so the claims against my client, Providence, would be dismissed based on lack of standing.

THE COURT: I've dismissed the other two -- again, unfortunately, we've consolidated them and are now sort of unconsolidating them in this respect: I'm going to dismiss the

FILED DATE: 10/1/2021 4:23 PM 2021CH03759



other, what would have been the other two complaints at this time without prejudice, because I find I don't have jurisdiction to address those cases because the named plaintiffs in those cases, at this point, there's been no allegation sufficient to establish Article III standing, all right?

MR. FISHER: Okay. Yes. Thank you, Your Honor. I heard you say "abeyance," and --

THE COURT: Well, that's --

MR. FISHER: -- that made me think stay and that I still had a lawsuit I was a party to --

THE COURT: At this point, it's dismissed without prejudice, all right?

MR. FISHER: Thank you for the clarification.

THE COURT: Okay. All right? So hopefully, you can work with Judge Nachmanoff, and I'm going to give him a call to tell him what I've done so that you can really try to with laser sharpness focus in once you get the new complaint, focus in on the core discovery, which should put issues in a much better light, all right?

MR. VAHLE: Thank you, Your Honor.

THE COURT: All right, thank you.

MR. KARLSGODT: Thank you, Your Honor.

MS. McKNIGHT: Thank you, Your Honor.

THE COURT: All right. We'll recess court until

Case 1:19-cv-01050-LMB-MSN Document 132 Filed 01/18/20 Page 30 of 30 PageID# 1307

FILED DATE: 10/1/2021 4:23 PM 2021CH03759



11:00.

(Which were all the proceedings
had at this time.)

CERTIFICATE OF THE REPORTER

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter.

/s/
Anneliese J. Thomson